Case No. 4,455.

The EMILY B. SOUDER.

[7 Ben. 550.] [1]

District Court. S. D. New York. Jan., 1875. [2]

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]
[2] [Modified in Case No. 4,458.]

D. B. Eaton, for libellants.
W. R. Beebe, for claimants.

BLATCHFORD, District Judge. The North Atlantic Steamship Company, as owners of the steamship Monterey, and William G. Furber, her master, for themselves and all others entitled, bring this libel against the steamship Emily B. Souder, to recover salvage, for services rendered by the Monterey to the Souder, in towing her into the port of New York, on the 25th of August, 1865.

The libel alleges that the Monterey, while on a voyage from New Orleans to New York, discovered the Souder in a disabled condition, with signal flying, whereupon the master of the Monterey hauled up for and came alongside of the Souder, and found that her propeller was gone, and that she was in a totally disabled condition, and in peril, and unable to make a port, and short of provisions, and in shoal water; that the master of the Monterey was requested by the master of the Souder to take the Souder in tow for the port of New York; that the master of the Monterey thereupon took the Souder in tow, and made for the port of New York, where he arrived with the Souder on the next day; and that the libellants are entitled to a reasonable share of the Souder, for the salvage thereof. The prayer of the libel is for reasonable and proper salvage in proportion to the value of the Souder.

The answer admits that the propeller of the Souder was broken, and alleges that the Souder was tight, staunch and strong, and well and fully supplied with masts, sails, crew and provisions for her voyage, and had proceeded on said voyage, with such injured propeller, from a place in South America to the place where she was spoken, and had passed within easy distance of many ports in the West Indies and the United States, and, having fully means and ability, had reached the place where the Monterey spoke her; that, in order to expedite the passage of the Souder to New York, the master of the Monterey was requested to tow her to New York, but she was in no peril, nor did the Monterey, or her master or crew, incur any peril in the performance of said service; that the Monterey towed the Souder to the port of New York, but, at all times during the towage, the Souder was tight, staunch and strong, and well and fully provided with men and all necessaries, except her propeller, for her voyage; that the Monterey rendered service to the Souder in the towage of her, but only towage service, and when the Souder was on ground in which pilots from the port of New York are to be found, and within a very short distance of where tugs can easily be had, and in the most direct route of the whole steam marine of the United States; that, at the time of the service, the Souder was owned by, and in the possession of, persons other than the claimants; that, after the service was performed, the Souder arrived at the port of New York, and the claimants, having a mortgage and lien thereon, proceeded to duly foreclose said mortgage, and became the owners of the vessel, without notice of the libellants' claim; and that thereafter she left the port of New York, and proceeded and completed various voyages, and any lien of the libellants, if the same ever existed, was lost.

It will be useful, in the first place, to recur to the voyage of the Souder prior to her being spoken by the Monterey. She had come from the Pacific ocean around Cape Horn. She was a screw steamer. She lost her screw about 250 miles from Maranham, in Brazil. She went, by means of her sails, to Maranham, and there a new screw was put in. She then started for New York, under steam. One blade of her new screw was broken off between 400 and 500 miles from St. Thomas, and the other blade was broken off within 40 or 50 miles of St. Thomas. She then went to St. Thomas by means of her sails. She remained there 7 or 8 days, and took in a supply of provisions, but did not put in a new screw, and left St. Thomas for New York under sail alone, intending to go under sail to New York. She had been out 28 days, under sail alone, and had arrived within some 50 to 100 miles of Sandy Hook when she was fallen in with by the Monterey. She had plenty of provisions. Her hull was tight. Her spars, rigging and sails were in good order. She was in good condition, as a sailing vessel. As a steam vessel, she was deprived of her steam power. She had some passengers on board, all of whom had come from ports beyond St. Thomas. She behaved well on her passage from St. Thomas. She was one year old. She was put upon a dry dock, after her arrival at New York, and it was found that nothing was the matter with her, except the loss of her screw, and the roughing up of the copper in two or three places on her keel. She had spare sails on board. Her suit of sails was foresail, topsail, top-gallant sail, fore staysail, jib, fore spencer, mainsail, and gaff topsail.

The Monterey, going the same way with the Souder, and bound to the same port, descried the Souder ahead and to the westward, showing what the master of the Monterey understood to be a signal. The Monterey bore down to the Souder.

There is very little conflict as to the circumstances under which the Monterey took hold to tow the Souder. The only point of difference among the witnesses is as to whether the Souder first asked to be towed, or whether the Monterey first proposed to the Souder to tow her. But all the witnesses agree that, when the Monterey hailed the Souder and asked what was wanted, the reply was that the Souder wanted the Monterey to take off the Souder's passengers. This was said in view of the fact that each vessel was informed of the destination of the other. Then, when the Monterey hesitated to take

the passengers, in view of where the Souder had come from, and the risk of quarantine, the next suggestion, by whichever it was made, was to tow the Souder to New York, the common destination of both vessels. If the flag set by the Souder was a signal, it is apparent it was a signal to have herself spoken, with a view to having her passengers taken off. Failing that, and clearly with a view on the part of the Souder solely to expediting her progress, her being towed was proposed by her or assented to by her. The master of the Monterey could have had, and did have, no idea that the Souder was, or thought she was, in distress or peril or apprehension, other than as such condition may have existed, in judgment of law, because, being a steam vessel, fitted to be propelled by both steam and sails, she had been deprived of her means of steam propulsion, leaving her means of sail propulsion unharmed. The evidence of the master of the Monterey, and of Craig, the chief engineer, shows that the former did not, before he reached the Souder, or at any time, have any idea that her flag was a signal of distress, or that she had summoned the Monterey for any other reason than because her passengers desired to reach New York sooner, or for any other purpose than to have such passengers taken to New York by the Monterey, over the short intervening distance. Furthermore, when towing was suggested, because the passengers could not be taken off, there were negotiations opened by the Souder with a view to fixing a price for the towing. The Monterey was a large steamer, not a tug in the business of towing. and the Souder naturally desired to know what the price for towing would be. The Souder wished to make a bargain for the towing. The Monterey refused to make a bargain. Devoe and Sinsabaugh, both of them, testify that the master of the Monterey, while declining, when asked, to name a price, said to the Souder that he would not charge more than was right. The evidence is not satisfactory to show that the master of the Monterey, in taking hold of the Souder, to tow her, considered that he was entering on a salvage service, for a salvage compensation, or that he considered that he was entering on any other than a towage service. Nor is there any satisfactory evidence that the master of the Souder had any idea that he was subjecting the Souder to a claim for salvage compensation, based on the rescuing of the Souder from existing or apprehended peril. That both parties contemplated that the compensation for the service would be larger to the Monterey than to a smaller vessel or to a tug in the regular business of towing, may be assumed.

But the circumstances above referred to do not have the effect to reduce the service rendered by the Monterey to a mere towage service, although they have an important bearing on the question of the amount of the salvage compensation. It was said by this court, in the case of The Saragossa [Case No. 12,334]: "In order to make a salvage service, it is not necessary that a vessel, whether sailing or steam, should be unnavigable, or that a steam vessel should be injured not merely in her machinery, but in her hull or her sails also. * * * A steam vessel which has lost the use of her steam machinery by an accident, is not in the same condition she would ordinarily be in, although she is sound in hull and masts, and has the use of her sails, and a service rendered to her under such circumstances, by towing her, is not a mere towage service, but is a salvage service." These are well established principles. The Reward, 1 W. Rob. Adm. 177; The Charlotte, 3 W. Rob. Adm. 68, 71; The Charles Adolphe, Swab. 157.

I think, therefore, that the service of the Monterey is not to be compensated merely as a towage service. But how much shall be awarded to her as salvage is a much more difficult question.

The master of the Monterey testifies that he was about 93 or 94 miles south by west from Sandy Hook, and out of sight of land, when he took the Souder in tow; that he should judge she was in about twelve fathoms of water; that the wind was northerly and light, and she was making little or no progress through the water with her sails; that, in proportion to the size of the Souder, her canvas was not sufficient to work to windward or keep off shore, with a strong breeze on shore; that her canvas was but an auxiliary motive power, and her principal motive power was steam; that the Souder was in an unsafe or dangerous position with an easterly gale or a strong east wind; that the wind frequently blows on shore over the section of the ocean over which the Souder was towed; that the Souder was not prepared to carry the requisite amount of canvas to make her navigation safe from where she was taken in tow to New York, in case of the wind's blowing on shore; and that the place where the Souder was when he first saw her, was not a part of the ocean frequented by steamtugs towing for the harbor of New York.

Bragdon, the first officer of the Monterey, testifies, that the Souder was making very little progress with her sails, and was not heading for New York or any Northern port; that she was out of sight of land, and was about 100 miles from Sandy Hook; that. when she was taken in tow, the wind was northerly and light and the weather was clear; and that the sails of the Souder were all set; and that she had not enough canvas to work off from a lee shore, or to make her safe in a gale of wind from any direction, and was not rigged with spars to carry sufficient canvas to keep her off from a lee shore, or to make her safe in a gale of wind from any quarter.

Craig, the chief engineer of the Monterey, a witness for the claimants, testifies, that the weather was pleasant and clear; that the Souder was steering about east northeast; that the wind sprang up fresher after the Souder was taken in tow, changing to the southwest, having been north to north by west and light, when she was taken in tow. and that the wind continued fair until they reached the Highlands, a five knot breeze. both ships having their sails set.

Winchester, a ship master, who superintended the building of the Souder, and went in her as master from New York to Charleston and back, on her next voyage, testifies that with the sails she had, there was no difficulty in navigating her by her sails; that there was no trouble about her sailing on the wind or wearing, but she could tack only in smooth water, being obliged to wear in rough water; that in foul weather or storms she would carry as much canvas as any other vessel. because in foul weather or storms an ordinary sailing vessel would have to reduce her canvas, and the Souder could carry her canvas longer than ordinary vessels. her sails being smaller; that he would consider it prudent and safe to go on a voyage with the Souder, with her propeller gone, in the condition she was in when she arrived at New York on this occasion; and that her hull was stronger than that of almost any sailing vessel. and she was heavier timbered than any ordinary propeller, and had diagonal iron braces, which sailing vessels do not have.

Devoe, the chief engineer of the Souder, testifies, that, when the Souder was taken in tow, the weather was calm, with a light wind from the south; that, during the towing. the weather was fine; and that the wind sprang up favorably after the towing commenced. by there coming up a good sailing breeze, it having been favorable before, but light and calm.

The Souder was approaching the coast, where danger to her, if a strong wind blowing towards the land had sprung up, might have existed. While she might have been able, with abundant sea room, to keep from peril, by the use of her sails, in case of severe winds or storms, yet she was nearing what would have been a lee shore, in case of a strong wind blowing towards the land. and the reaching her destination required her to keep nearing the shore more and more. She had been deprived of her chief means of propulsion and control— her steam power—of that which would have been effective to keep her off from a lee shore, in case of necessity. Her normal condition was to have the use of both steam and sails. The court cannot indulge a conjecture, or enter into a calculation, upon the opinions of witnesses, as to how much effective ability to keep off from a lee shore would have remained to the Souder, in case of necessity for doing so, through the use of

her sails alone. It is sufficient that she had been designedly equipped with steam power as her principal power, and with sails as auxiliary, and that she had been deprived of the former, and that such deprivation necessarily left her more exposed to danger from a lee shore, on her approach to the land, than she would have been if she had not been deprived of her steam power.

Nor ought the compensation which otherwise would be awarded to the Monterey to be diminished because of the fact that the wind and weather continued to be favorable after the towing commenced. Such fact may be a good reason for not increasing the compensation. because it shows that the Monterey in fact encountered no peril from wind or weather while performing the service.

There remain to be considered the duration and particulars of the service, and the value of the respective vessels and their cargoes.

The master of the Monterey testifies that the Monterey had a short supply of coal for completing her voyage, in case of adverse winds or impediments to her, but, the weather being fine after taking the Souder in tow, she had ten or twelve tons left when she arrived in New York; that she made the Souder at noon, and took her in tow at 1.30 p. m., and cast her off at the pier in New York at 7.45 a. m., the next day; that the towing imperiled or affected the insurance of the Monterey, and added greatly to the perils of navigation. in consequence of her being near the coast and approaching a port the approaches to which were covered by many vessels. causing danger of collisions. and caused her to wait for daylight to enter the port of New York, and also added greatly to the risks of harbor and river navigation; that the towing delayed the Monterey eight or ten hours; that the Monterey was not as much at command with the Souder in tow as without; that the daily expense of navigating the Monterey, for men, coal, provisions, &c., was between $300 and $400; that, in casting off the Souder, the hawser of the Monterey got jammed. and had to be cut. and a part of it, worth $30 or $40, was lost, and the value of the remainder was impaired $40 or $50 in addition; and that the Monterey had about thirty cabin and about twenty steerage passengers, and about forty officers and men. The other witnesses make the detention of the Monterey by the towing not so long as eight or ten hours.

The master of the Monterey testifies, that the Souder was about 1,200 tons burthen, and was of the value of about $200,000; and that the value of the Monterey was about $200,000, and of her cargo about $330,000, and she was about 1,050 tons burden. This is all the testimony on that subject.

The master of the Monterey testifies, that, in his opinion, a reasonable compensation for the service, is $20,000.

There is nothing to sustain the defence set up in the answer, that the lien of the libellants for salvage was lost.

In the case of The Rebecca Clyde [Case No. 11,621], this court awarded as salvage the sum of $4,000. The allowance was affirmed, on appeal, by the circuit court, against the objections of both parties. The case was one of a disabled steamer, towed by another steamer for nine hours, the towing steamer having lost twenty-four hours of time in rendering the service. The saved vessel and her cargo were worth $70,000, and the saving vessel and her cargo were worth $275,000. The saving vessel was bound from Boston to Philadelphia, and turned aside to tow the other vessel to New York. The saved vessel had been disabled in a gale, her mainmast and smokestack were lost, her machinery was disabled, her boiler was shifted, her boats and mainhatch were swept away, one of her cargo ports was stove in, she was making no substantial progress in a direction that would have enabled her, with the sails she could command, to reach New York (her port of destination) or any other place of safety, she showed a flag of distress, union down, and she was picked up at a point which was one of danger to her, crippled as she was, because of its distance from the usual track of vessels going up and down the coast, and of the direction of the wind. Although there was no peril to life or property on the part of the saving vessel, the service was held by this court to have been, so far as the saved property was concerned, a salvage service of great merit and value. The circuit court, in its opinion in that case, says: "The balance of the evidence regarding the place where the Rebecca Clyde was taken in tow, the progress that she had already in fact made under her few sails, before she received aid, the state of the weather, and the probability of her soon reaching anchorage ground, while it does not show that she was out of danger, goes far to reduce the service rendered by the libellants to a towage service—a service, nevertheless, not of an ordinary character, since it involved, on the part of the libellants' vessel, a deviation from her proper voyage, delay in its consummation, and unusual expense in furnishing hawsers." The allowance for damage to hawsers and pilotage (as part of the $4,000) was $800, of which $140 was for pilotage. "But there was very little, and perhaps no danger incurred by the vessel, or her officers or crew. if in the vigilant exercise of competent skill. It was a valuable aid, rendered to a vessel in distress, entitling the libellants to a compensation furnishing reasonable reward, and such as will operate as an inducement to them, and to others similarly situated, to render like aid. I cannot, upon all the proofs, say that the decree does not award this."

The circumstances of the present case are even more forcible, in their tendency to reduce the service to a towage service, than were the circumstances in the case of the Rebecca Clyde; and it seems to me that a reasonable and proper allowance in this case is the sum of $3,000. Of this, the owners of the vessel will receive, in the first place, $75 for damage to hawser. The master of the Monterey will receive $250. The remaining $2,675 will be divided as follows: one-half, or $1,337 50, to the vessel; and the remaining $1,337 50 to the officers and crew, to be divided among them, including the master, in proportion to their respective monthly wages, the apportionment to be made by a commissioner, if required. The claimants will be charged with the costs.