## THE JESSOMENE.

### SPRECKELS *et al. v.* THE JESSOMENE.

*(District Court, N. D. California.  October 17, 1891.)*

1. SALVAGE—TOWAGE SERVICES—EXORBITANT AGREEMENT.
    The ship Jessomene, on a Saturday night, after vainly attempting to enter the Golden Gate in a furious gale, put to sea, but, failing to weather Point Reyes light, came to anchor in 18 fathoms of water. During the night she dragged her anchors into 11 fathoms, and then lay within 150 yards of sunken rocks, where loss of ship and crew would have been almost certain had she drifted upon them. Sunday morning she again began to drag, when the maintop-gallant masts were cut away, after which she held fast. Monday afternoon the gale had somewhat abated, but was still dangerous, when the tug Relief appeared, and demanded $12,000 for towing her in. After vainly trying to secure better terms the master acceded to this demand upon the tug's threat to leave them. *Held*, that the agreement was made under compulsion, and would not be sustained.

**2. SAME—COMPENSATION.**

The Relief was in some slight danger of fouling her hawser in her propeller, and was assisted by the tug Active, also owned by libelants, which carried messages between her and the Jessomene, and accompanied them into the harbor. The ship, cargo, and freight were worth about $89,000, the Relief $50,000, and the Active $57,000. Libelants also maintain three other powerful tugs always in readiness to assist vessels in distress, the whole being at an expense of about $7,500 per month. They sometimes sent their tugs out for vessels reported to be in distress, without success. *Held*, that they were entitled to $5,000 as salvage.

In Admiralty. Libel of the ship Jessomene, her cargo, and freight, for salvage.

*Andros & Frank*, for libelants.

*Charles Page*, for claimants of ship, cargo, and freight.

Ross, J. This is a cause of salvage. On the 21st of February last the ship Jessomene was bound into the port of San Francisco with a cargo of coal. Near the whistling buoy she took on board a pilot, and, on approaching the entrance to the Golden Gate, an attempt was made to tack the ship. She missed stays, in consequence of which the pilot wore her around, and she put to sea again. Night was coming on, the wind was blowing almost a hurricane, and the sea was furious. A little while after the ship was worn around, and was standing off, a light was discovered which proved to be Point Reyes light, but, in consequence of the direction of the wind, it was found impossible to weather the point, and it became necessary to let the ship's anchors go, which was done in 18 fathoms of water. The wind continued to increase in violence, and all that (Saturday) night she rode at her anchors, but dragged from 18 into 11 fathoms of water. The first anchor had about 120 fathoms of chain on it, let out to the end, and the second anchor about 90. The master's wife and two children were on board. Sunday morning the storm was unabated, and the ship again began to drag her anchors. To prevent it the fore and maintop-gallant masts were cut away. That so far eased the ship that she ceased to drag. During the whole of Sunday she lay there with her ensign union down, as a signal of distress. She was within a half a mile of the shore, but within about 150 yards of sunken rocks, upon which she would inevitably have been wrecked had her chains parted. During Sunday and Sunday night many people were upon the adjoining shore, attracted there by the situation of the ship, and in the hope of rendering assistance in the event she should be wrecked. At one time during Sunday the crew wanted to take to the boats, but the captain and pilot advised them that no one could reach the shore, and upon the assurance of the captain that he, with his family and officers and pilot, would remain, they concluded to stay by the ship, and did so. For some reason no report of the perilous position of the ship was known in San Francisco until some time during Monday, when the tug-boat Relief, belonging to the libelants, was advised of it, and immediately, to-wit, about 11 o'clock A. M., went to the assistance of the ship. The report was that she was in Drake's bay, but when the Relief arrived there she found that the report was, in that respect, untrue. Between 1 and 2 o'clock in the afternoon, however, she found the

ship in the position already described. When the Relief reached the ship the captain of the tug asked the master if he wanted to be towed, and the latter replied that he did. The master asked what the captain would take him in for, (meaning into the harbor of San Francisco,) and the captain said for $12,000. The master offered $500, when the captain said he would land the master and the ship's company in safety, but that he would not touch the ship for a cent less than $12,000. The master then offered $6,000. The captain of the tug again refused to touch the ship for less than $12,000, and said that if the master did not want him he was going. When the master offered $500, the pilot said to him that the captain of the tug would not entertain any such a proposition, and advised the master to offer the captain $6,000, which he did, as has already been stated, but the captain of the tug repeated that he must have $12,000. The pilot testified that the master then asked his advice in respect to the matter, and the pilot responded:

"'If the tug is going off to leave us, we have got no other tug, and it is going to blow very hard to-night. I cannot see that you can do any other way than to employ him.' I said it was worth certainly $12,000 to save this ship and cargo, and all hands. After that he (the master) said, 'Take the line on board.'"

The master, on his direct examination, was asked by the proctor for the claimant:

"*Question.* As you lay at your anchorage on the Monday, when the tug Relief came up and took hold of you, in your opinion, what danger was there of your ship being lost? *Answer.* At the time I didn't see there was any danger, because the danger had passed over. I couldn't see there was any danger on Monday at all, as the weather was fine and the danger had passed over. *Q.* Why, then, did you take a tug-boat, and agree to the demand of the tug-boat master for twelve thousand dollars? *A.* Simply because I did not know how long I might have to lay there. I knew that my owners would not care for me laying there, and as I had been there from Saturday night at eleven o'clock until Monday afternoon at three o'clock, and no person came to me, I did not know how long I might be laying there. I never saw a sign of a tug anywhere, and if anything had happened, — which, of course, I am not supposed to foresee, or what the weather was going to be like, or what was coming on, — I was not the least afraid of my anchors not holding, but I am not supposed to know was the chain going to part, or what weather I was going to have. You will understand, as well as I do, if so be that anything happened, and the ship had gone ashore and all hands had been lost but myself, and I was saved, I should have been tried for murder, and very likely hung. If I hadn't been hung, I should have been transported for having the Relief there and not accepting it."

The evidence is very conflicting in regard to the condition of the wind and sea at the time the Relief reached the ship, and, indeed, as to their condition during the whole of Monday. If the truth be, as contended by the libelants, that the wind and sea then continued very heavy, and that the ship remained in imminent danger of her chains parting, and of being wrecked on the rocks, with the almost certainty, in that event, of death to all on board, the consent of the master to pay $12,-000 for the assistance of the tug, given only after and because of the re-

fusal of the captain of the latter to render any assistance for a less sum, and upon his threat to leave the ship to her fate unless the demand was acceded to, must, and should be, held to have been given under compulsion, and therefore not binding. While courts of admiralty will give effect to contracts for salvage services freely made, and which are not unconscionable, they will not, and ought not, to enforce such as are extorted from those in distress and who cannot help themselves. One of the principal reasons why such courts are liberal in making awards for such services—decreeing sums far in excess of the actual value of the services rendered—is based upon the theory of some degree of heroism in the salvors; of a willingness on their part to take risks and brave dangers to succor the helpless. And as a reward for such conduct, and as an inducement, in the interest of humanity and of commerce to others do likewise, courts of admiralty are extremely liberal in awarding compensation. But such reasons are wholly wanting in a case where the salvor stands off and, in effect, says to the master in distress: "I will not aid you at all unless you agree to pay me so much money, and unless you do so at once I will leave you to your fate, and let your ship go to destruction."

Such conduct does not constitute a high standard by which to measure the compensation for salvage services. While, as has been said, the evidence is very conflicting as to the condition of the wind and sea on Monday, there is no dispute about the fact that there was a very fierce gale and a very heavy sea Saturday night, Sunday, and Sunday night. There can be no doubt from the evidence that both wind and sea had greatly abated by Monday, and the strain upon the ship's chains consequently become lessened; but that, during that day, until the ship was towed away, the strain continued very great, is, I think, quite certain. The pilot testified that in some of the heavy seas on Monday 45 fathoms of chain could be seen. But that the wind had greatly abated on Monday is conclusively shown by the fact that on Monday morning a schooner with a deck-load of lumber passed between the ship and the sunken rocks, and the further fact that during the afternoon of Monday a number of vessels sailed into the harbor of San Francisco, some of them under full sail. But there was undoubtedly a very heavy sea prevailing on Monday, as well as a stiff breeze. The fact that the chains withstood the heavier wind and sea of Saturday night, Sunday, and Sunday night, while rendering it probable that they would continue to stand the strain of Monday, was by no means conclusive. The surging of a large and heavily-laden ship in such a wind and sea as the ship in question was subjected to must necessarily weaken the chains. Precisely when the breaking point would be reached, of course, no one could know. But that there was danger on Monday that the chains might part, is, I think, clear from the evidence, and, had they parted, that the ship and all on board would have been lost is hardly disputed. I therefore conclude that the ship as well as all on board were in much danger at the time of the arrival of the Relief on Monday afternoon. It is equally clear from the evidence that the ship could not extricate herself from her per-

ii ,us position. Moreover, there were then indications of continued bad weather, and, as a matter of fact, very heavy squalls were encountered that night as the ship was being towed into the harbor by the Relief. What effect they would have had upon the ship had she remained in the position in which she was cannot, of course, be known, but they would undoubtedly have increased her danger very much. Between half past 3 and 4 o'clock on Monday, and shortly after the Relief had made fast to the ship, another tug-boat, the Active, belonging to the libelants, arrived, and she rendered assistance by carrying messages between the ship and the Relief while the ship's anchors were being taken in, the prevailing wind making it difficult to hear from the one vessel to the other. The Active remained, performing that service, until the Relief took the ship in tow, which she did about 7 o'clock Monday evening, and accompanied the ship and the Relief to an anchorage in the harbor in order to be of service should her services be required. The anchorage was reached about 1 o'clock A. M. of Tuesday. A few minutes after the Active reached the ship in the afternoon of Monday the tug-boat Wizard, belonging to the Merchants' & Ship-Owners' Tug-Boat Company, arrived and tendered her services, but they were declined by the master of the ship, for the reason that he had already engaged the Relief. The ship was not, therefore, wholly dependent upon the libelants' boats, which is a circumstance proper to be considered in determining the question of compensation to be allowed the libelants. The Relief, in the condition of the sea at the time, was in some danger of getting her hawser fouled with her propeller, and also of getting foul of the ship's chains, but, with the exercise of proper caution on the part of the tug, I do not think the danger was great.

It was shown in evidence that the Relief is of the value of $50,000, and the Active of about the value of $57,000, and that both are well equipped, not only for towage purposes, but also for rendering assistance to vessels in distress. It was also shown that libelants maintain three other powerful tug-boats, the ordinary running expenses of the entire fleet (not including the wear and tear of hose and other appliances) being about $7,500 per month. They are maintained for the purpose of towing vessels in and out and about the harbor of San Francisco, and also for the purpose of rendering assistance to vessels in distress. One of them is always kept on watch at night, ready to start at a moment's notice, and the others with banked fires, and can be got ready and under way in from 10 to 15 minutes. It was also shown that sometimes libelants send their tugs in quest of vessels reported to be in distress without success, for which, of course, they receive nothing. The value of the ship Jessomene was shown to be $69,000, that of her cargo, $8,-760, and of her freight, $11,580. While the conduct of the captain of the Relief is strongly to be condemned, in consideration of all the facts and circumstances stated, the court will allow the libelants for the services rendered the sum of $5,000, for which, with costs, a decree will be signed.