## THE VIOLA.

## MURRAY v. UNITED STATES.[1]

*(Circuit Court, E. D. Pennsylvania. July 1, 1892.)*

1. SALVAGE—WHAT CONSTITUTES—TOWAGE.
   Towing into port a lightship which had broken adrift during a severe storm, and been carried out to sea, is not a salvage service, when the lightship was not in peril when she was taken into tow, and could, with a little delay, have reached a place of safety without assistance.

2. TOWAGE SERVICES—COMPENSATION.
   In determining the compensation for a towage service, the value of the towing vessel and cargo, the risk incurred, the fact that the vessel was not intended or adapted for towage service, the chance of endangering the towing vessel's insurance, the time spent in and the danger incurred by lying by the vessel towed before the towing could commence, and the time spent in deviating from her course, may be considered, although the service rendered does not amount to a salvage service.

Suit under Act March 3, 1887, (24 St. at Large, p. 505,) by Lawrence Murray, master of the British steamship Viola, to recover for services rendered in towing the United States lightship No. 45 into port. Decree for libelant.

*John F. Lewis,* (*Curtis Tilton,* of counsel,) for libelant, cited, as to what constituted a salvage service: *The Saragossa,* 1 Ben. 551; *The Charles Adolphe,* Swab. 155; *The Reward,* 1 W. Rob. 177; *The Charlotte,* 3 W. Rob. 71.

*Robert Ralston,* Asst. U. S. Atty., and *Ellery P. Ingham,* U. S. Atty. The service rendered was not salvage, but towage, which has been described to be "the employment of one vessel to expedite the voyage of another, where nothing more is required than the accelerating her progress." Dr. LUSHINGTON, in *The Princess Alice,* 3 W. Rob. 138, at page 140; Carver, Carriage by Sea, § 340, p. 343.

BUTLER, District Judge. On the night of April 8th, during a very severe storm, the government lightship No. 45, worth about $50,000, (anchored off the coast of Delaware,) broke adrift, and was carried out to sea. She was well equipped for keeping afloat, and sufficiently provisioned for a three months' voyage. Her crew consisted of a mate and five men,—the master being on shore. While the storm lasted she was kept before the wind, and until it passed she could not get back, without aid. She raised a signal indicating her desire for towage, and, after passing two vessels unable to render this service, she met and came into communication with the steamship Viola, a large vessel loaded with sugar and bound for New York. This vessel, deeming it unsafe to attempt the service until the storm should abate or moderate, remained by until the next day when she took the lightship in tow, under the circumstances described by the witnesses, and brought her to Cape Henry, a distance of about 125 miles. In doing this the Viola was compelled

[1] Reported by Mark Wilks Collet, Esq., of the Philadelphia bar.

to deviate slightly from her proper course to New York; and her crew in passing back and forth between the vessels, incurred the risk usual to such services performed in a rough sea. When taken in tow the lightship had not sustained any injury, nor had her crew as the several members of it say, seen any cause for alarm. They had declined to be taken off by the passing vessels referred to. The signal for towage was raised, as they testify, because it was considered important to get the ship back to her station without delay which could only be done with the aid of such help.

The view I entertain of the case renders a more minute statement of facts unnecessary. The libelant's claim is for salvage services. To sustain it I must find that the lightship was in peril when the Viola came to her aid. This the evidence does not permit. She was drifting before the wind in a severe storm, but was riding safely, had suffered no injury or loss, was thoroughly provisioned, with everything in good condition. She had safely passed through the violence of the tempest, and in a little while, with the improved weather which followed, could have returned to the station, or have gone into port elsewhere, without assistance. The libelant's witnesses admit that the situation involved no peril if her crew was competent for its duty. They infer however that it was not—that it was deficient in knowledge and experience—from what they saw of the vessel's movements. This inference is sought to be supported by the cross-examination of the crew on the general subject of navigation. Some answers of Kambaren, a Norwegian, whom the respondent put forward as possessing accurate knowledge on the subject, would certainly show extraordinary ignorance if he made them understandingly. They are so extraordinary, however, as to justify belief that he did not understand the questions. It is incredible that a man who answered other questions on the subject so intelligently, and who seems to have had considerable experience in navigating vessels, should have knowingly made such answers. He understands our language very imperfectly and it may well be inferred that he misunderstood the questions. It is clear that the management of the vessel carried her safely through the violence of the storm; and although she was not kept from drifting as the witnesses describe, it is at least open to question whether another crew could have done better under the circumstances. In my judgment, it is not shown that the men were incompetent for the service, and that the vessel was consequently in danger. I believe as before stated, that with the improved weather which followed they could have safely brought her back, or have taken her in port elsewhere. She signaled for assistance, as the mate says, not because she was in distress but because she was needed at her station earlier than she could get there without it. There was no alarm on board, as is shown not only by what the members of the crew say, but also by the fact that they refused to be taken off by passing vessels. I regard the testimony of Commander Reed, a navigator, of large experience, respecting the ship's situation, her management by the crew, and her probable danger, as entitled to considerable weight.

Notwithstanding, however, the services were, not such as command salvage compensation, they were highly meritorious, and should be compensated accordingly. The Viola was a large and valuable vessel and was carrying a valuable cargo. She was not designed for towing, nor adapted to the service. In lying by the lightship and going out of her course to do so in the storm, and afterwards taking her in tow under the circumstances, she incurred serious responsibility—some risk to herself, her cargo and crew, as well as the possibility of endangering her insurance. These things should all be considered in determining the amount due for her services. She behaved well and generously and should be liberally compensated. The services were extraordinary, and there is no rule by which their value can be measured with exactness. While they are not salvage services they partake somewhat of the nature of such services. They were voluntarily and ungrudgingly rendered, under circumstances that made them very valuable to the government and should be ungrudgingly paid for. In view of all the considerations involved, I think the libelant should have $2,500; and this sum is accordingly awarded. A decree may be entered for this amount with costs.