### THE ROBERT S. BESNARD.

#### (District Court, D. South Carolina. April 13, 1906.)

1. SALVAGE—NATURE OF SERVICE—SALVAGE OR TOWAGE.
    If a vessel is in a position which requires towage service only, the mere fact that she had previously suffered injury does not change the nature of the service to one of salvage unless there are some circumstances of peril, immediate, or to be reasonably apprehended, from which the vessel is relieved, or some hazard encountered or unusual work done by the relieving vessel.

    [Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, §§ 23, 24.]

2. SAME—EVIDENCE CONSIDERED.
    The British bark, Besnard, on a voyage from Montevideo to New York in the winter was struck by a waterspout when about 500 miles east of Charleston, losing a part of her masts, and having left six only of her 19 sails. She was sound in hull, and able to make with her remaining sails five or six knots an hour with favorable winds, but the wind becoming northerly after a day or two, she turned for the port of Charleston. Her master asked two or three passing vessels for a tow, which he did not get, but at no time made any signal of distress. One vessel offered to take off himself and crew which he refused. He reached the vicinity of the Charleston lightship at night, and anchored. The following morning libelants tug went out and towed the bark in. Her master endeavored to make a bargain for the towage, but the master of the tug declining, he accepted the service, leaving the matter open. The master of the tug had received notice the night before from a passing

vessel that she had spoken the bark, and that the sea was heavy, but did not go out until the next morning. The wind was no more than fresh, the bark was securely anchored, and was in no unusual peril, and the towage service was not attended with danger, and was no more than required by all such vessels entering the port. *Held*, that it was not a salvage, but merely a towage, service; but that her master, having accepted it without an ageement for the compensation to be made, had notice that something more than the usual charge would be made, and an offer to pay $1,000 having been made, that such sum would be awarded, but without costs to libelant.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Salvage, §§ 23, 24, 80–82.

Salvage awards in federal courts, see note to The Lamington, 30 C. C. A. 280.]

In Admiralty. Suit for salvage service.

Mitchell & Smith, for libelants.

Bryan & Bryan, for respondents.

BRAWLEY, District Judge. The British bark Besnard, with a cargo of dry hides sailed from Montevideo November 1, 1905, bound for New York, and on December 25th, in latitude 32° 30′, longitude 71° 30′, about 500 miles east of Charleston, was struck by a waterspout, losing a part of her mainmast, and all the yards thereon, and her mizzen topmast, all of her topsails being carried away. About 65 feet of the mainmast and mizzenmast were left, and the foremast was left intact. The only sails remaining were her foresail, lower topsail, mizzen staysail, spanker, and one jib; another jib being subsequently rigged up. With these sails she endeavoured to proceed to her destination. With the wind on her quarter or on the beam she could make five or six knots an hour in a good breeze, but after proceeding for a day or two the wind came from the northward so strong that her master did not like to risk going around Hatteras at that time of the year, and determined to seek a nearer port, and made for Charleston or Savannah. About the last day of December he spoke the steamer Shaumut, south of Frying Pan Shoals, and learned that these shoals bore about east 30 miles off. He asked the Shaumut to report him, but says it was blowing so heavy that he knew that he could not get his hawser aboard, and did not ask for assistance. He also passed a German steamer and an English tramp, and the American steamer, Monterey, of the Ward Line, and asked the latter for a tow. They refused the tow, but offered to take off the master and crew, which offer was declined. On January 9th the cruiser Charleston, bound for this port, passed in between 3 and 4 p. m. and he asked for a tow, but could not make out the signals in reply. He hoisted his flag, and asked that he be reported, but never put up at that or any other time any signals of distress. About 6:30 o'clock in the evening of that day he made the light of the Charleston light ship, which has a visibility of about 11 miles. At first he took this light to be that of a pilot boat, and burned the usual flare for a pilot, but soon discovered that it was the light ship, and about the same time saw the land, and making towards the light ship, taking soundings all the

time, he came to anchor about 8 o'clock, about 4 miles from the light ship, in water variously stated at from 5 to 7 fathoms. About 7 or 8 o'clock the next morning the steam tug Protector came out, took him in tow, and brought the bark into the harbor, arriving about 12 o'clock. The libelant claims as for a salvage service; the claimant, that the services were merely towage services.

The averments of the libel sworn to by the master of the tug make a case for salvage, and if supported by the proofs it would be clear that the remuneration to be awarded should be governed by the principles which determine salvage services, and not merely by those which govern towage services. The libel avers that on the afternoon of January 9th a wireless message was received in the city of Charleston from the United States cruiser, Charleston, stating that she was standing by a bark in distress (which bark was the George S. Besnard) and that the bark requested assistance and help. The proof does not sustain this averment. The cruiser was not standing by her, and there is no proof that the bark asked anything of the cruiser except a tow. The commander of the cruiser was not examined, and the master of the bark has testified that neither at that, nor at any other, time during his voyage had he given any signal of distress, or asked for any help except for a tow; nor does the master of the tug support this averment in his testimony. He says that in the afternoon of the 9th, "I was sitting in the pilot house. Mr. Rhett [the mayor of the city] came in with a wireles telegram, stating that the Charleston had spoke a vessel off Cape Romain, and the sea was very heavy. Capt. Revel got the message just a little ahead of me," and it appears from the testimony that Revel sent his tug, Waban, out that night to look for the bark, but failed to find her. It appears further in the testimony that the Waban and the Protector worked together, although owned by different owners, under some agreement, the precise nature of which was not disclosed. The libel does not aver that any service rendered by the Waban should be superadded to that of the Protector, and so far as appears no claim is made for compensation for such service. If it had been true that the bark had been reported as in distress and needing help and assistance, the conduct of the Protector would have been very reprehensible. The cry of distress was a trumpet call to duty, and would have demanded immediate response, for every hour of delay wonld have added to the danger. Promptitude in rendering assistance is always a material element in salvage cases. The conduct of the master of the Protector in going to bed at his home that night and deferring until the next morning any attempt at assistance goes far to negative the claim that this is a salvage service rendered to a ship in distress.

Nor is the next material averment of the libel supported by the proofs. It is that about 7 in the morning he found the bark "disabled and at anchor in about 5 fathoms of water off the east end of Rattlesnake Shoal. The wind was from the east and a heavy sea was rolling from that direction. That she was helpless, leaking, and in a position of great danger." The testimony of Igoe places the bark at some distance from the Rattlesnake Shoal. The wind, according to

his own testimony, was north northeast, which was an off shore wind. The preponderance of the testimony is that the ship was anchored in about 6 fathoms of water. She was drawing between 17 and 18 feet. The master testified that his soundings showed about 7 fathoms. Burke, one of the witnesses for libelant, testifies to 6 fathoms less ¼. Igoe made no soundings and took no bearings. Two witnesses for the claimant testify that a day or two after the ship was brought in, he gave the depth of water as 6 fathoms. He denies having made any statement of that kind. As to the leaking, the testimony is that during the voyage from Montevideo the ship was pumped every two hours; that as the cargo consisted of dry hides, which would be injured by water, it was necessary to keep her dry; that after the injury from the strain of the waterspout she took in a little more water, but not more than could be easily handled by her pumps; that on the evening when she came to anchor she was pumped out, and that there was no pumping until the next morning. After her arrival in New York, when her cargo was discharged, no damage from water was discovered from any leakage in the hull of the ship, although there was some damage from leakage from the decks. She was taken to New York in tow of a powerful tug, which naturally subjected her to a great strain in the very heavy weather encountered. It is perfectly clear, therefore, that there was no leaking except such as is usual in wooden vessels; and that her hull was tight and strong, for after she was brought into Charleston she was not put on the hard or on the ways, and her bill for repairs was about $100, mostly for caulking her decks, there being no caulking below the water line. All of the testimony goes to show that after the bark came to anchor, about 8 o'clock in the evening, there was no apprehension of danger by master or crew. It was a clear moonlight night, the weather reports showing that the wind was blowing from 8 to 9 o'clock that night 12 miles per hour, the highest velocity from 8 p. m. to 8 a. m. the next morning being 16 miles. Making all due allowance for the fact that the wind out at sea has a greater velocity than that reported at the Weather Bureau, the wind could not at any time have been more than a fresh wind. All hands went to sleep; the only watch being the customary anchor watch. The allegations of the libel as to the condition of the ship and as to her danger are not sustained by the proofs. It remains therefore to determine what was her actual condition. That the bark was in great peril at the time she was struck by the waterspout or squall is undisputed. She was disabled by the loss of all her topsails and yards, and by the injury to her mainmast and mizzenmast, and had only 6 sails out of a complement of 19, and was 500 miles from land, and with the most favorable wind could make about 5 knots an hour. That she had sufficient power left to make the land was proved by the event. That her master did not consider his situation dangerous is proved by the fact that having opportunities and offers to take his crew from the bark, he rejected them, having faith in his ability to make a port unaided, although he did seek to expedite his voyage by asking for a tow. That he was in some danger in his

crippled condition is undenied, but he had passed through his peril, and the period of storm and stress was over when he cast anchor within 4 miles of the light ship. The libelants contend that the usual anchorage ground for sailing vessels coming to this port was nearer the light ship. Capt. Brown for more than 30 years master of the buoy tender, and well acquainted with this coast, testifies that anywhere from ½ to 5 miles of the light ship was safe anchorage ground, and that ships coming from the northward should properly cast anchor at some distance to the north of the light ship. The master of the bark had been at this port about 25 or 30 years ago, but the entrance channels have been much changed since that time. While it may be customary for vessels of that character to cast anchor nearer the light ship, there is nothing to lead to the conclusion that he was not safe where he lay, or that he could not have gone nearer to the light ship if he had so desired. Whether the depth of water at that point was 5 or 7 fathoms, it was abundant. He had 5 anchors aboard his ship, and put but one overboard. His whole conduct showed that he considered himself in a safe place, and there being nothing in the condition of the sea or weather which threatened danger, all hands went to sleep except one officer and a seaman, the usual anchor or harbor watch.

There is considerable variance in the testimony as to the location of the ship. As located by Igoe on the chart the bark lies north northeast of Rattlesnake Shoal; that is, 6 points up from the east and 2 points from the north, and the depth of water at that point on the chart is given as 4 to 4½ fathoms; in the libel it is stated at 5 fathoms. Soundings and bearings are the only sure tests of location at sea, and as none were taken, the location given is a mere guess. The master of the bark, the mate, and the man at the wheel give the soundings and her bearings, and this locates her about 4 miles seaward of the point indicated on the chart by Igoe. The truth sometimes lies in the middle; on the one side, Igoe, familiar with the locality, but giving no bearings by which to verify his guess; on the other, strangers to the locality, who give soundings and bearings; but wherever she lay, there is no sufficient reason to believe that she was in a place of danger. The testimony should be strong, uncontradicted, and overpowering to induce the belief that the master of a ship of over 40 years' experience, who had demonstrated his skill and nerve in bringing her in a crippled condition through storm and perils over 500 miles, would, on a clear moonlight night, in full view of the light ship and of the land, taking soundings all the while, with an abundance of water all about him, and no adverse winds, put her in a place of danger and go to sleep. Much testimony and all the probabilities are against such assumption. The libelants claim that if her anchor chain broke she might have been cast ashore, but it did not break, and there is no proof of its weakness, while there is proof that she had other anchors and chains which could have been used in case of need, and the wind was from a quarter not likely to drive her ashore. She showed no signals of distress, and had never shown any, even during her period of greatest peril, when crippled

and far from land. She asked for nothing except a tow. This much she needed, even if she had had all her sails. There is nothing to show that the tug encountered any extraordinary peril. Some of the witnesses for the libelants have testified that there was a very heavy sea which dislocated one of her ventilators, and that she took in a great deal of water on her way out to the bark, but there is nothing to show any unusual conditions, or that there was any danger except such as is incident to that service in taking a tow in the open sea. The tug, Waban, took in about the same hour a schooner near the light ship, and the charge for such service seems to have been the usual one. The allegation in the libel that there was a heavy sea running from the east is scarcely supported, for all the witnesses agree that the hawser was thrown to the starboard side of the bark, which, as she was lying was the sea side, and if there had been a heavy sea from the east the tug would have gone to the port, which was the inshore side of the bark.

Burke, one of the witnesses for the libelant, testifies that the boats on the bark were rotten and unseaworthy. This seaman it appears had at one time deserted the ship, and had been arrested and put in jail. He had endeavored to obtain some gratuity from the master, and threatened to make it hot for him if he did not give it. Witnesses whose credibility is unimpeached, one of them a boat builder well known here, have testified that the lifeboat was sound and in good condition. The vessel was classed A $1\frac{1}{2}$ for four years from June, 1904. The value of the bark as fixed by the sale in the port of Charleston was $8,500, her freight was $4,200, earned upon her arrival in New York, from which should be deducted the cost of towing her there, about $2,000; and the value of the cargo between $300,000 and $320,000. The testimony is that the tug, Protector, was 100 feet long and about 200 horse power, and her value about $22,000 or $23,000. She is owned by the Virginia-Carolina Chemical Company, a mining company, and her ordinary occupation is the towing lighters and other vessels of her owners in and about the harbor, with occasional sea towage. Outside of her equipment for that service, she has powerful pumps, available in case of need, for wrecking purposes, but she had no cables, kedges, or wrecking anchors, nor crew for wrecking.

From the facts, as found, it is difficult to see wherein this differs from an ordinary towage service, but the line of demarcation between towage and salvage is not perfectly defined. The case for the libelants rests mainly upon what took place at the bark on the morning when the Protector went to her. The testimony of Igoe, the captain of the tug, is that the master of the bark asked him "what he would tow him in for. I said, 'Captain, you are in no position to talk tow, your vessel is in distress.' The captain hesitated a while, then asked if I had a hawser." Andrews, the master of the bark, reports this conversation: "I asked the captain what he was going to tow me in for. He said he would not make any bargains, so I asked him to give me a hawser." Being asked if he knew what the rates of towage were at this port, he said he did not. On cross-examination, being

asked "why on earth when Capt. Igoe would not fix any charge, and told you you were in distress, and you could not talk price to him," he answered: "did not say I was in distress at all." "I asked him a couple of times to make a bargain, and then I saw plainly myself that there was a combination between these two tugs, because if there had been opposition both tugs would have come to me and then I stood a chance of making a bargain;" and in answer to another question, he said, "he did not say anything about distress whatever." On the part of the libelants it is contended that if the bark had not been in distress her master would have insisted on making a bargain for the services to be rendered. The claimant's contention is that being at the mouth of the port, and a tug being necessary to take him in, and believing that there was a combination between the two tugs that were in sight, he took the Protector, leaving it open to pay whatever in all the circumstances the service was worth. Whatever may be the right rule to distinguish towage from salvage, it surely cannot be permitted that the master of a tug may arbitrarily say: This is not a case of towage, and that the ship, accepting service under those conditions, is estopped from showing that the service was towage, not salvage.

The cases are clear that even if a bargain is made to pay a stated sum as salvage, the courts will relieve if such bargain is unconscionable and advantage is taken of circumstances of duress, and will allow only what is just and equitable. Upon the same principle it would seem the duty of the court to inquire into the circumstances from which it is sought to imply a contract and determine whether an advantage has been taken by an alleged salvor of the supposed necessities of others to give a color other than the true color to services about to be rendered. While it is not claimed here that any bargain was actually made, that the service was to be considered a salvage service, and while the master denies that anything was said about his being in a position of danger, there is an implication from what took place that the master was put upon notice that something more than ordinary towage would be demanded, and the acceptance of the services of the tug in such conditions puts upon the vessel the burden of proving that nothing more than towage was required, and raises a presumption that it was in the nature of a salvage service, and the case has been considered by me in that aspect. The testimony makes it clear that the bark was not in fact in a position of danger at the time the service was rendered, and there was no reasonable cause to apprehend danger, except such as is incident to all vessels at sea. There was no signal of distress or request for any other assistance than a tow, and the service rendered was precisely the same in kind and in degree as that which would have been required if the vessel had been intact. It was the same as that rendered at the same time by the Waban to the four-masted schooner lying near, and the case for the libelant rests upon the proposition that any assistance to a disabled vessel is in the nature of salvage. A number of cases have been cited which would seem to support such a proposition. They have been carefully examined and will be found in a foot note.[1] An

[1] See note at end of case.

analysis of each case would unduly extend this opinion. Most of
them rest upon a dictum of Dr. Lushington in The Reward, 1 W.
Rob. 174, which is cited in nearly every case on this subject. Any
opinion of so learned and experienced a judge is entitled to great
weight, but its value as authority must be considered in connection
with the facts which gave occasion to it. The Reward, on a voyage
from London to Jamaica, encountered a violent gale which drove her
upon the Mapland Sands. When the weather moderated she was
backed off the Sands, with the loss of her two best anchors and
cables, and the starboard end of the windlass and bulkhead were
carried away. She was proceeding towards Sheerness for repairs
when she fell in with the tug whose services were accepted, and she
was towed back to London. Her owners contended that it was a
mere towage service. Dr. Lushington, in an opinion of 12 lines, after
stating this contention, says:

"In my judgment the service of the salvors is a service of a higher nature.
I apprehend that mere towage service is confined to vessels that have re-
ceived no injury or damage, and that mere towage reward is payable in
those cases only where the vessel receiving the service is in the same condi-
tion she would ordinarily be in without having encountered any damage or
accident."

It seems that the circumstances of this case bring it within the
qualification, and that the service rendered here was precisely the
same and no other than that which would have been rendered if no
damage or accident had happened to the bark.

Another opinion of the same learned judge is also cited—The
Charlotte, 3 W. Rob. 68. This vessel was on a voyage from Bombay
to Liverpool, and in consequence of the master mistaking the light, she
got among the breakers. The wind was blowing a violent gale of
fog and rain, and a tremendous sea running, which drove the ship
towards the rocks. Both anchors were let go, but would not hold,
and her masts were by order of the master cut away and went over-
board with all the sails and rigging. In this dismantled state the
salvors launched a boat through the surf, but in consequence of the
violence of the gale, after several attempts, were unable to reach her.
The gale having afterwards moderated, the second boat was
despatched, which succeeded in reaching her. The ship having been
taken in tow by the four boats, was by great exertion and labor kept
from the breakers and forced through the heavy sea then rolling and
towed into a place where she was anchored in safety. The master
having been taken from the vessel by the salvors, procured a steamer,
which towed her to Liverpool. Dr. Lushington says:

"Looking at these facts, which must be taken as admitted facts, I cannot
but think that the service of bringing this vessel to anchor in Long Island
Channel was prima facia a service of salvage. According to the principles
which are recognized in this court on questions of this description all services
rendered at sea to a vessel in danger or distress, are salvage services. It
is not necessary, I conceive, that the distress shall be actual or immediate,
or that the danger shall be imminent and absolute. It will be sufficient
if at the time the assistance is rendered the ship has encountered any
damage or misfortune which might possibly expose her to destruction if the
services were not rendered."

Another case cited is that of The Princess Alice, 3 W. Rob. 139. The Princess Alice was running for the Tees; the steamboat, Conquest, being moored within the river, and seeing that she was coming too far to the southward signaled her to keep her more to the northward; but the schooner continuing her former course, struck heavily on the South Gar Sand, where she remained for some time, with the sea beating half mast high over her, and the seamen taking to the rigging. The steamer attempted to go to her assistance, but was driven back by the heavy seas, which caused her to ship much water. The schooner afterwards came off the Sand and was driving towards the North Gar Sand, when the steamer backed astern, amidst the broken water, and having with difficulty taken the schooner in tow pulled her head round clear of the Sand and proceeded with her into the channel, shipping two seas, which filled the engine room as high as a person's knees. On the part of the schooner it was contended that there was no attempt made by the steamer to assist her whilst on the South Gar Sand, and there was no danger of her being driven on to the North Gar Sand. Dr. Lushington says:

"Without attempting any definition, which may be universally applied, a towage service may be described as the employment of one vessel to expedite the voyage of another when nothing more is required than the accelerating her progress. Many circumstances, it is obvious, may arise in the course of such employment which may convert the service into the nature of a salvage service, as, for example, where a ship in tow is disabled in her hull or rigging, or where she is aground, or where the service itself is necessarily attended with danger or extraordinary labor to the towing vessel."

He held that in that case the service was only a towage service.

These are the chief English cases relied on. The leading American cases cited are The Colon, reported under the title McConnochie v. Kerr (D. C.) 9 Fed. 50, and The Plymouth Rock, Id. 413. Both of these cases were decided by Judge Brown, an eminent admiralty judge. The Colon, upon one of her regular trips from Aspinwall to New York, had her machinery disabled and signaled The Pomona, an iron steamship, on her voyage from New York to Montego Bay, Jamaica, for assistance. The master of The Colon desired to agree upon a lump sum for the service, which the master of The Pomona declined, and it was agreed that the question of compensation should be left to the owners. The Pomona took her in tow about 4 a. m. and towed her to a safe anchorage in Fortune Bay, arriving about 3:16 p. m. The master of The Colon testified that at the time of the accident he was provided with a full set of sails; that the wind was a light easterly trade, with periods of calm, and he could have made under sail about a knot an hour. When asked if he could not have worked himself into some port, he replied:

"We were at the mercy of the winds; if we had good winds we could have gone anywhere; we could have reached anchor and sent parties for relief."

He also testified that the gales incident to that region were northers and hurricanes, and that a hurricane would have placed the ship in jeopardy. Upon these facts Judge Brown held that the service was in the nature of salvage, citing the opinions of Dr. Lushington

above quoted. The master of The Pomona had been compelled to deviate from his voyage, and to lose nearly a day, and he held that if The Colon had not been in apprehension of danger, and had been able to continue her voyage under sail, without any reasonable fear of hazard, no reason appeared why he should not have continued on his voyage instead of interrupting it and proceeding to Fortune Island for repairs, and that the master of The Pomona would not have been justified in going back upon his course unless there had been some apprehension of danger to The Colon; that, by the accident to The Colon, she became unseaworthy for navigation in those waters, and the interests of commerce required that no unnecessary risks should be taken by a vessel's continuance at sea in a disabled and unseaworthy condition, and demanded that encouragements be given by rewards as in cases of strict salvage, to assist all vessels so situated, whenever desired, into port or to a safe anchorage, as truly as in cases of immediate and present peril.

The Plymouth Rock (D. C.) 9 Fed. 413, was a sidewheel passenger steamer, originally constructed for navigation upon Long Island Sound, but was withdrawn from the Sound and used as an excursion steamer, not being fitted either in structure or equipment for general navigation or the coasting service. She was making a trip to the iron pier at Long Branch with 500 or 600 passengers aboard. When about a mile beyond the Hook the weather and sea were found to be rough, and the wind blowing a moderate gale, when her steam pipe was broken, letting all the steam from her boilers escape, and thereby became completely disabled, and helpless in her motive power. She settled into the trough of the sea as soon as she lost her headway. Broadside to the wind, and in that position, with the great area of her upper works, and the consequent great expanse to the force of the wind, under the combined effect of a strong wind and tide, and a heavy sea, she must have speedily gone ashore. Her sole dependence was upon her anchors. At the time of the accident the Germania, a staunch, powerful, sea going steam tug, was cruising at sea, in search of vessels needing assistance, and straightway went to the assistance of The Plymouth Rock. The pilot of the latter asked to be towed in, and inquired the price. The captain of the Germania answered that it was no time to make any bargain, that it would take hold and leave it to be settled how much it was worth. It was held that this was a case of salvage, Judge Brown using this language:

"To say that The Plymouth Rock, upon becoming completely disabled by the loss of her steam power, within a quarter of a mile of the shore, as I hold she was when the Germania reached her, with her light draft and excessive free board exposure to the wind, and a northeast gale and a heavy sea on the New Jersey coast, and with only two-thirds of the ordinary equipment in anchors and chains of full sea going vessels, was in a situation to afford a reasonable apprehension of danger, would, I think, be stating the case very mildly, and it is too obvious to require further comment."

These are the chief cases cited in behalf of libelant, and the rule established by them seems to be that towage service rendered to a vessel in distress, which by reason of its disability requires as-

sistance either to take it to its destination or to a place of safety, thus relieving it of danger, actual or apprehended, is in the nature of salvage, but I do not think that this rule governs in a case where the service rendered is not required because of the disability. In other words, if the vessel is in a position which requires towage service only, I do not apprehend that the mere fact that she had previously suffered injury changes the nature of the service, unless there are some circumstances of peril, immediate or reasonably to be apprehended, from which the vessel is relieved, or some hazard encountered, or unusual work done by the relieving vessel. The distinction between towage and salvage appears in the following cases: The Emily B. Souder, Fed. Cas. No. 4,458, on her way from Callao to New York, lost her propeller near St. Thomas, but having sails as auxiliary, made her way towards New York. When 90 or 100 miles therefrom she signaled the Monterey, going in the same direction, and asked her to take off her passengers. This was declined, and then towage was proposed, but the price could not be agreed on. The District Court held it a salvage service, and awarded $3,000. Upon appeal, Chief Justice Waite held it to be towage of an unusual character and reduced the award to $1,000. "It is well settled" says he, "that if there is no actual or probable danger, and the employment is simply for the purpose of expediting the voyage, such service is towage and not salvage."

In The Viola, 55 Fed. 829, 5 C. C. A. 283, a light ship broke loose from her moorings in a storm, and was driven before the gale 150 miles from her station. Colors were set showing she was adrift, but she rode out this gale without loss or damage. The steamer Viola, in response to a signal, took hold of her and towed her to a place of safety, claiming salvage on the ground that she was unmanageable and at the mercy of the winds and waves, with an inexperienced crew and incompetent officers. The court held that it was not a case of salvage, and made an allowance for extraordinary towage.

The New Camelia, 105 Fed. 637, 44 C. C. A. 642, a steamer enrolled in the coasting trade, with 150 passengers aboard, about midway of Lake Ponchartrain, broke her shaft and was thereby disabled, having no mast or sailpower of any kind. The District Court held, "as a matter of fact, that Lake Ponchartrain is at times a dangerous water, sudden squalls being more or less common, and that the New Camelia was in distress," and awarded 5 per cent. of her value to the tug, Clarabel, as salvage. The Circuit Court of Appeals held that the steamer was not in great peril, and that the services of the Clarabel were simple towage services. The other cases cited by claimant are in the footnote.

Salvage is in the nature of a bounty for extraordinary exertions as distinguished from payment for ordinary exertions, being the outgrowth of public policy, and designed to encourage persons who are under no legal obligations to do so to go to the rescue of vessels exposed to perils beyond their own ability to subdue by giving a reward in addition to compensation for the work done. The amount

of such bounty or reward depends upon the success achieved, the value of the property saved, and the degree of danger from which it was rescued, and is enhanced or diminished according to the skill or courage displayed, the time and labor bestowed, and the risk to persons or property encountered by the salvors. While there are many ingredients, the one essential element is that the property shall be saved from danger either actually impending or reasonably to be apprehended. In the absence of such peril it is not salvage, however beneficial and meritorious the service may be. As said by Mr. Justice Story, in The Emulous, Fed. Cas. No. 4,480:

"Salvage is a compensation for the rescue of the property from present, pressing, impending perils, not for the rescue of it from possible future perils. It is allowed because the property is saved, not because it might have been otherwise lost upon future contingencies. Subsequent perils and storms may enter as an ingredient into the case when they were foreseen to show the promptitude of the assistance and the activity with which the business was conducted, but they can scarcely avail for any other purpose."

He says further:

"It would be as unreasonable to increase salvage because of the unfavorable state of the weather after the arrival in port as to diminish it because of the favorable state of the weather, and to introduce such ingredients which were neither foreseen or acted on would deliver the court open to conjectures resting upon loose probabilities, the extent of which could never be measured, and to be guided by speculations always questionable and sometimes deceptive."

The policy of the law and the interests of commerce require that persons equipped for such service should be encouraged to go to the assistance of vessels in distress and to encounter the risks and dangers frequently incident thereto, by the hope of a reward not stinted to mere compensation for the work and labor done. Any extraordinary efforts, therefore, to save those encompassed by perils should be regarded in a liberal spirit, and rewarded with no niggardly hand, but it should never be forgotten that a vessel in distress is not a prize of war, and salvors cannot be permitted to devour what the ocean has spared. The award which the law intends as an inducement to courage and exertion is not intended to stimulate the appetite of avarice or gorge the maw of greed. A service may be beneficial and meritorious, but not necessarily salvage.

As appears from the statement of facts this bark was sound and tight in hull, with such masts and sails as enabled her, unaided, to make a port. She had already encountered and safely passed through hardship and dangers infinitely greater than any likely to be met. Her master had never intimated any apprehension of personal danger or any intention of seeking personal safety; for even when far out at sea he had declined offers from passing steamers to take off himself and crew. Any peril that can properly be said to have been impending was inconsiderable, uncertain, and distant, existing rather in the imagination of the putative salvors than in reality. Not one of those elements likely to enhance the claim for liberal remuneration enters here. There was no special skill or dexterity displayed, no fatigue endured, no courage evinced, not the least danger encountered. Even

were it conceded that this is a case of a vessel in distress, and, therefore, a case of salvage, it would be salvage of the lowest order, and the remuneration justly earned would be little more than compensation pro opere et labore.

The service would be regarded as a simple case of towage, and remunerated as such, but for the fact that the master of the tug gave notice to the master of the bark that something more than towage would be demanded. The acceptance of the service in those conditions, therefore, requires the payment of other and higher remuneration than for an ordinary towage service. It appears from the testimony that the sum of $1,000 was offered in the negotiations for a settlement before the libel was filed. The offer was made without prejudice, and manifestly in the expectation of avoiding the expenses of litigation, but no objection was offered to the testimony of the master of the bark, who gave the details of this negotiation, and I do not, therefore, see that I can do otherwise than accept this as an estimate put by the owners of the bark on the value of the services rendered; but inasmuch as this offer was made in order to avoid the expense of litigation, it would be unfair to require the payment of this sum and the expenses in addition, and while costs in this court usually follow the decree, they should not be allowed here. As an additional reason for not allowing them is the demand for a bond of $20,000 for the release of the ship, which in the circumstances was unconscionable.

A decree may be entered for $1,000; costs to be paid by libelant.

NOTE.

List of cases cited by the libelants: Mayo v. Clark (C. C.) 1 Fed. 735; McConnochie v. Kerr (D. C.) 9 Fed. 50, 53–55; Stone v. The Jewell (D. C.) 41 Fed. 103; The Steamer Leipsic (D. C.) 5 Fed. 108, 113; Brooks v. The Adirondack (D. C.) 2 Fed. 387; S. C. 872; Atlas Steamship Company v. Steamship Colon (C. C.) 4 Fed. 469; The Saragossa, 1 Ben. 551, Fed. Cas. No. 12,334; The Emily B. Souder, 15 Blatchf. 185, Fed. Cas. No. 4,458; Corwin v. The Barge Jonathan Chase (D. C.) 2 Fed. 268; Ehrman v. The Swiftsure (D. C.) 4 Fed. 463; The Athenian (D. C.) 3 Fed. 248; The 'Reward, 1 W. Rob. 174; The Charlotte, 3 W. Rob. 71; The Princess Alice, 3 W. Rob. 138; The Raikes, 1 Hagg. 247; The Phantom, L. R. 1 Adm. 58; Holmes v. The Joseph C. Briggs, 1 Ben. 81, Fed. Cas. No. 6,640; The Westminster, 1 W. Rob. 232; Padelford v. Bordman, 4 Mass. 554; The Plymouth Rock (D. C.) 9 Fed. 414; Hennessey v. The Versailles, 1 Curt. 356, Fed. Cas. No. 6,365; The Bella Constance, 33 Law J. (N. S.) 191; The Leipsic (C. C.) 10 Fed. 589; The Albion, Lush. 282; The Aztecs, 21 Law T. (N. S.) 797; The Fannie Brown (D. C.) 30 Fed. 220, 221; Mason v. The Blaireau, 2 Cranch, 266, 2 L. Ed. 266; The Viola (C. C.) 52 Fed. 172, and Id., 55 Fed. 829, 5 C. C. A. 283; Sonderburg v. The Towboat Co., 3 Woods, 146 Fed. Cas. No. 13,175. 2 Pars. Shipping & Admiralty, 282; The Spokane (D. C.) 67 Fed. 256; The North Erin (D. C.) 71 Fed. 430; the Jessomene (D. C.) 47 Fed. 906; Hume v. J. D. Spreckels & Bros. Co., 115 Fed. 53, 52 C. C. A. 645; The Dupuy De Lome (D. C.) 55 Fed. 93; The Steamer Rosedale (D. C.) 20 Fed. 447; The International Nav. Co. v. Obdam (D. C.) 72 Fed. 543; The Rita (D. C.) 88 Fed. 523; The Lasca (D. C.) 133 Fed. 1005; The South Bay (D. C.) 139 Fed. 273. List of cases cited by the respondent: The Emily B. Souder, 8 Fed. Cas. 657 (No. 4,455); The Emulous, 8 Fed. Cas. 704–708 (No. 4,480); The Viola, 55 Fed. 829, 5 C. C. A. 283; The New Camelia, 105 Fed. 637, 44 C. C. A. 642; The Laura, 83 Fed. 311, 27 C. C. A. 540; The Monticello (D. C.) 81 Fed. 211; The Jarlen (D. C.) 43 Fed. 176; The Beaconsfield (D. C.) 67

Fed. 144; The J. C. Pfluger (D. C.) 109 Fed. 93; The Hesper, 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175; The Apache (C. C.) 124 Fed. 908, 915; The Saragossa, 21 Fed. Cas. 427 (No. 12,335); The Gambetta, 74 Fed. 259, 20 C. C. A. 417.