## THE EDILIO.

(District Court, E. D. North Carolina. September 12, 1917.)

### No. 146.

1. SALVAGE ⬬48—RIGHT TO COMPENSATION—DISPOSSESSION.
    In a suit for salvage by a second set of salvors, based on the dispossession against their will of salvors who were then continuously conducting salving operations, the burden rests on libelants to prove that the first salvors had no reasonable prospect of success, and, in the absence of such proof, their dispossession will be held wrongful and the subsequent services as inuring to their benefit.

2. SALVAGE ⬬9—CONTRACT—CONSTRUCTION.
    A contract by the master of a stranded ship with the owner of fishing boats to use the same in pulling on the ship, the pay, if not agreed upon, to be fixed by a court, was not one for salving the ship, which precluded the master from discharging the boats, when their work proved ineffectual, and employing others.

3. SALVAGE ⬬30—NATURE OF SERVICE—COMPENSATION.
    A partially loaded steamship stranded on the Cape Fear River bar. The bottom was sand, and the weather was fair, and she was in no immediate danger. The master made a contract with libelant for the service of its five fishing boats to pull on the ship, the pay to be fixed by the court if not agreed upon. At the end of three days, during which the boats pulled about two hours each day during high tide, and by direction of the pilot ran the ship's anchors, her position not having been appreciably improved, the boats were discharged and others employed by which the ship was lightened and with the assistance of a revenue cutter pulled free, at a total expense of $11,380. The pulling of libelant's boats was of no material benefit, but the running of her anchors contributed to her final release. The value of ship and cargo was about $1,100,000, and of libelant's boats not to exceed $135,000. *Held*, that the service rendered by libelant was one of salvage only of a low order; that taking into consideration the injury to the boats and their equipment and the loss resulting from their withdrawal from libelant's business, of which the master of the ship was advised before the contract was made, libelant was entitled to an award of $10,000.

4. SALVAGE ⬬30—NATURE OF SERVICE—GROUNDS OF AWARD.
    Where a salvage service is rendered after negotiation at arm's length to a vessel not in imminent danger and at no material risk, a court will be slow to make a large award as might be done if the service was voluntary and rendered in response to a prompt and generous willingness to relieve distress and save life and property from imminent peril.

⬬For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit for salvage by the Fisheries Products Company and others against the steamship Edilio and others. Decree for libelants.

Rountree & Davis, of Wilmington, N. C., for libelants.

E. K. Bryan and Robert Ruark, both of Wilmington, N. C., for claimants.

CONNOR, District Judge. The Fisheries Products Company is a North Carolina corporation, engaged in fishing for menhaden on the Atlantic Coast and converting them into oil and other products. During the year 1916, the company was "the owner by lease, demise and charter," of five fishing boats. On, before, and after October 28, 1916, the boats were being used along the coast of North Carolina, between Norfolk and Charleston, in catching and bringing fish to the factory, located near Wilmington, N. C. T. H. Hayes was president of the corporation.

The Edilio is a steel steamship of 392.6 feet length, 57.6 feet beam, gross registered tonnage 4,719, net 2,916 tons, built at Sunderland, 1910, home port Genoa, Italy. She was in first-class condition in all respects.

On September 20, 1916, she sailed from Genoa, with her captain, Guiolo Cola, and a full crew, arriving at Baltimore, Md., October 13, 1916, under orders of the "Minister of War, Government of Italy"— directions of "Italian Admiralty." She brought no cargo. She took on, at Sparrow's Point, near Baltimore, under direction of Gen. Dozzi, representing Italian government, 5,200 tons "old steel rail—billets— from two to six feet in length." She had no charter party. The bill of lading did not show amount of freight to be paid by the government. The steel rail billets were valued, in the manifest, at $83,200. Her log shows that she sailed from Baltimore, October 26, 1916, at 10:40 a. m. and proceeded, "engines with full speed" to Wilmington, N. C., where she was to take a cargo of cotton, from Alexander Sprunt & Sons, and continue her voyage to Genoa. Her log, October 28, 1916, shows that at 7 o'clock a. m. she reached the Wilmington Bar (Cape Fear River). "Not being any pilot in sight we entered the channel. On reaching abreast of the Red Buoy, No. 4, we saw the pilot coming, but on account of the strong current, caused by the incoming tide, the ship failed to answer to her helm and dragged on the sand bank of the port side. A few minutes after, and precisely at 7:30 a. m., the Wilmington Pilot boarded us, and with his assistance, we do all possible maneuvers necessary for the occasion to free the ship."

The testimony of the captain, taken upon deposition, November 8, 1916, corresponds with the log. Capt. Adkins, a pilot, says that he boarded the Edilio within five minutes after she grounded and "assumed command of the ship immediately on going aboard. Just before going aground she had no speed whatever. She was just drifting. * * * We had seen the ship as she was coming. We don't wait for signals for a pilot." The point at which she grounded, and her location, with respect to the ocean and the channel, is described by Capt. Adkins, who says: "She was headed for the channel, having drifted

ashore sidewise." She was drawing about 20 feet aft, when she went in. The soundings taken by the pilot showed that she was in about 19 feet of water. Capt. Cola says that, when the vessel come to the bar, the wind was northeast, fresh wind—blowing about 15 or 20 miles an hour. Sea agitated "little bit." Capt. Adkins says, "Fresh blow, what I might call fresh gale, that is fine weather—east northeast, about 30 to 35 miles." This may be accepted as correct. Several of libel-- ants' witnesses testify that the vessel was on "quicksand," some say "live sand," and that she was liable to sink into the sand if not prompt- ly pulled off, or that the movement of the tide would bank sand around her keel and cut it away at the bow and stern, causing her to break in the middle. Bowen, a witness for libelant, says that he is familiar with the shoal on which the Edilio went aground; that she was in a dan- gerous position. "The sand down there is live and shifts on each side. It has a tendency to cut from the bow and stern of the ship and fill it up amidship." Several of the libelants' witnesses say that the shoal is composed of "quicksand," and that, at times, boats have sunk in it, lost; they were wooden boats, smaller than the Edilio. Charles St. George, Thomas St. George, P. T. Dicksey, Dunbar Davis, and E. H. Adkins say that the sand on the shoal is "live." "It is live on flood tide. The flood tide causes it to move, and on ebb tide it appears to settle down and become solid. The ship was in danger."

These, and other witnesses for libelants, say that she would, if not anchored, have moved further on the shoal—by the rise and fall of the tide, and its effect upon the sand.

Capt. J. J. Adkins, the pilot of 48 years' experience on the Cape Fear Bar, who went to the vessel, says:

"The bottom at that particular spot is what is termed level, but it is a mis- nomer to call it level; it don't fit. The tide doesn't make level bottom; there are little ridges, little hills and holes. That is because of the tide running over the waters; but, for all practical purposes, it would be considered level bottom. It is sand and shell. There are a great many shells in among that shoal, old broken up oyster shells, some very fine; but they get mixed up with the sand."

Referring to the danger of the vessel on account of the character of the sand, he says:

"I don't think there was any danger for the length of time for which the ship was ashore. I may be a little extravagant in that, but, Sir, my honest opinion is that the ship would lay there for years, without material danger or damage; that is my honest and candid opinion."

Jas. S. Williams has held master's license 19 years, on Cape Fear River and Bar, saw Edilio about 20 minutes after she went aground— was on the tug Resolute, and went to her. In regard to the character of the sand on which she lay, he says:

"I do not think there is any danger. Experience shows it is not the case there (that she would sink in the sand). Soundings show that it was not the case in this case; and in every other case of ships grounding there. I don't mean to say that water could not cut sand right under the bow and stern for a little ways."

In response to the question whether he knows the condition of the shoal there, what the bottom is, the character, he answered, "Yes, the sand," that he "didn't know of anything better."

In regard to the sand being "live," whether vessels would sink down in it, he said:

"At that particular place, small vessels have been wrecked there; they go so far and no further, stop; they never go out of sight. The fishing smack referred to is in about the same position she was a year ago. There are parts of wrecks that have been lying along that place for years and years. The Edilio didn't keep going. * * * I didn't consider her in any danger of damage, or of serious injury. She would have stayed there a long time; she would have stayed there several years, in my opinion."

There is other testimony, more or less conflicting, in respect to the character of the sand, and the probable effect on the action of the ship. The soundings, taken at several times, did not indicate that she was sinking in the sand, or going further on the shoal, or that she was in imminent danger of serious injury from either source. Much of the testimony, in that respect, is speculative, with probably an unconscious tone, from the temperament, viewpoint, and relation of the witnesses to the parties, and the result of the litigation. The character of the shoal, the sand, upon which the Edilio grounded, is relevant from several viewpoints.

The issue, in regard to the terms upon which libelants rendered service to the Edilio, is clearly presented by the pleadings and the testimony. Libelants allege:

"That on Saturday afternoon, about 7 p. m., Thos. H. Hayes, president of the libelants' company, with the captain of the John L. Lawrence, proceeded to the ship Edilio, when she was grounded on the Cape Fear Bar and, at the request of the captain of said steamship Edilio, went abroad the said steamship and was requested by the said captain to salve the ship, and agreed to do so; but the amount of the salvage was not agreed upon."

He alleges that, pursuant to said contract, he proceeded on Sunday morning, October 29, 1916, with his fishing boats, to perform the salvage service, etc., all of which is set forth in the libel; that the service was continued until Tuesday, October 31, 1916, when libelants' boats were ordered to cease their operations and service, and the hawser of one of them cut; that the ship was, thereafter, lightered by Jas. S. Williams, and pulled off the shoal by the revenue cutter Seminole; that, on October 29, 1916, and on each day thereafter, until Tuesday, October 31, 1916, libelants' boats were engaged salving the Edilio, in accordance with the contract made with the captain, and were ready, willing, and able to continue to salve the said steamship, but were prevented from doing so by said captain; that libelants' president, Mr. Hayes, was ready and able to lighter the Edilio, and offered to do so, but was prevented by the captain of the Edilio.

Claimants deny that any contract was made, or entered into, by the captain of the Edilio with Mr. Hayes, president of libelants' company, for salving the ship, and allege that Mr. Hayes requested the captain of the Edilio that he be allowed to salve the said steamship, but this request was declined; that the captain of the Edilio, after talking with Hayes, did say to him that he would agree for the said Hayes, with his fishing vessels, to pull on the Edilio and see if they could pull her from the shoals, but that he would make no contract or agreement with the said Hayes, whereby the libelants would be

given the privilege of salving the said steamship, without first consulting with the agents of the said steamship at Wilmington; and it was further agreed, as said Hayes refused to make any agreement as to what his charges would be for floating said vessel, by pulling on her, if he could do so, that the amount of his compensation should be settled by the court, if the agents of the Edilio at Wilmington and the said Hayes could not agree, and to this the said Hayes assented.

[1] While not determinative of the case, it is important, from more than one point of view, to settle the issues, in this respect, raised upon the pleadings and the evidence. If, as contended by libelants, the captain of the Edilio contracted with Hayes that he should salve the ship, and Hayes undertook under such contract to do so, he was entitled, in doing so, to use all necessary and proper means of which he was capable to complete his undertaking, and receive compensation therefor. It is insisted that Hayes recognized the necessity for lightering the ship, and so stated to the captain; that he was prepared to do so; and that the captain assented thereto. It is well settled, upon just principles, that as between two sets of salvors, if it appears that the claim of a set of salvors to a share in the salvage reward is based upon the dispossession, against their will, of other persons who were at the time continuously engaged in salving the vessel in distress, and who were willing themselves to persevere in the service which they had begun, the court allows the claim only, if it is clearly proved that the first salvors had not any fair prospect of success. In the absence of such proof, the burden of which lies upon the second set of alleged salvors, the court holds the dispossession to be wrongful, and treats the subsequent service rendered by the wrongdoers as inuring wholly to the benefit of those who have been dispossessed, and not as entitling the wrongdoers to any share in the salvage award. Kennedy, Salvage, 168.

[2] From this principle it follows that if, as contended by libelants, the captain of the Edilio made a contract with Mr. Hayes, as alleged, and he (Hayes) was ready, willing, and able to perform on his part, he was entitled to do so, and the refusal on the part of the captain was wrongful. The deposition of Capt. Cola was taken immediately after the ship went aground and the filing of the libel. Mr. Hayes, and the other witnesses who heard the conversation between Capt. Cola and himself, were examined orally. Mr. Hayes says that, on Saturday, October 28, 1916, his fishing vessels had been out, and, upon coming in, reported that a steamer was ashore on the bar; that about 6 o'clock he received, while at his factory, about 11 miles distant, a telephone message from some one at Southport, stating that the captain was desirous of obtaining assistance. It does not appear from whom the call came. He went, at once, to the Edilio on his vessel, the John L. Lawrence. Capt. Lawrence Brown, Capt. Lemuel Brown, and Capt. Lester were with him. Capt. Lemuel Brown went on board the Edilio and shortly thereafter came to the rail, and said that Capt. Cola wished him (Hayes) to come on board for a conference. He says:

"We talked about the position he was in. He seemed to be very much exercised and worried over the position he was in, and wanted to know if he

could make a trade with me to work on the ship. I asked him what preparations he had made already. He said he had sent for the revenue cutter Seminole, and she had promised to be down there. This was Saturday evening, and she had not come, and it was worrying him. I told him I would gladly telephone, upon my return to Southport, to the proper officer of the Seminole, and request that they come down Sunday morning, as it was too late for them to get down at that time, to do any service. He said: 'No, I am not anxious for them, I want you. You have got considerable boats to work.' He asked me how many I had, and I told him I had five in operation at that time, and he said, 'I want you to make some kind of a trade with me to work on this ship.' I asked him what kind of a trade he desired to make. I told him my business was fishing and our expenses were heavy; we had 30 to 35 men to the crew; we had a factory that had upwards of 200 men on wages. I told him fish were in abundance along the coast and it would cost him a lot of money to employ me, or to employ these boats, to work on his steamship, and, so far as I was concerned, I would much rather he would get the revenue cutter, as I thought they would render what assistance they could for nothing. He immediately made the statement that the revenue cutter was insufficient to do the work that they might, but it was insufficient. He insisted that I come and pull the ship off. I told him that was impossible; that the ship was grounded too far; that she would have to be lightered, and I would rather he would make other arrangements. I told him that at least a dozen times. He insisted he wanted me, however, and finally I told him, if I went to work, that I would suffer large losses and I should be recompensed for it. He admitted that was so. I told him the only way I would do anything at all regarding that ship was to lighter her, salve her, take the cargo out. I explained to him how I was equipped, that my boats had holds in the center where we carried fish and we could take the billets. I told him I would have to lighter it; that I had holds; that I could put enough of these steel billets in my boats to give them ballast, which would give them better pulling power. * * * I told him it was needless to pull. However, he wanted us to assist, said he would have high tide to-morrow and believed the ship would float on this high tide. I told him I didn't believe that, however, if he agreed to salve the ship and wanted me to do that. * * * I told him if we could agree after we got through, we would try to agree, on my price for the services, and if we were unable to agree we would leave it to the admiralty court, and that seemed to suit him. That is the trade and agreement we made that afternoon. I was to go out Sunday morning and pull on the ship, and if we couldn't move the ship I was to proceed to lighter her."

### Capt. Cola says that:

When Hayes came on board the Edilio, Saturday night, he asked "If I wanted him to give assistance, and I said, 'Yes, we want your assistance for pulling steamer only, for pulling steamer.' I ask him how much he charge me, and he reply: 'I don't know, you must tell me how much you want. You know captain have big factory, and if come with fishing boats oblige to close factory.' He say, 'How much you want?' and I reply, '$200 each boat,' and he refuse to accept it. Later on I said too much talking; well, you pull steamer and the question be settled by the court. He says, 'Captain, take my advice, start lightering ship.' This, he says, on Saturday when grounded, 'take my advice, I have a great many fishing boats; can start lightering and to-morrow morning you can be floating.' I reply, 'No, I don't want to lighter ship, or do any other things without consent of Mr. Sprunt, our agent, and want to speak to him before I do other things.' "

It will be observed that the vital difference between Mr. Hayes and Capt. Cola consists in the question of salvage, including lightering, and of pulling on the ship.

Capt. Lemuel Brown says that he was in the cabin, and heard the conversation; that Capt. Lawrence Brown was also present; and that Capt. Willis was not in the cabin. After describing the manner in which the conversation began, he says that Mr. Hayes said:

"'We can't go to work on this steamer because our business is fishing and different from any other kind of business. I am at an awful big expense, because I am running five boats, and I have a big crew of men at the factory, which are idle when my boats are away from the factory, and no fish.' He explained that to the captain, and the captain undertook to make some kind of a trade. I don't know what it was, but Mr. Hayes told the captain of the ship, he said, 'I will take hold of this ship and go to work, under salvage basis, and no other way,' and the captain fully understood, for Mr. Hayes repeated it time and time again. It was as solid a contract as ever was made between two men. Capt. Cola accepted Mr. Hayes' proposition as to salvage."

The compensation was to be fixed by the court. "It was to be fixed on a salvage basis."

Capt. Lawrence Brown says:

"Mr. Hayes and the captain of the ship was talking about the ship being grounded, and the captain of the ship, he made some talk about some figures. Mr. Hayes told him, he said, 'I can't do anything like that. The only trade I can make with you would be under a salvage basis of floating your ship.' He said, 'You understand that,' and the captain said he did. He said, 'Go to the courts,' and he said, 'Yes.'"

In reply to a question, the witness says that Mr. Hayes said "something about lightering the ship"; that Capt. Willis was not in the cabin. Capt. Lester was on the Lawrence with Mr. Hayes, but did not go on the Edilio; that, when Mr. Hayes returned to the Lawrence from the Edilio, he said that "he had made arrangements to pull on the Edilio in the morning and he made it on a salvage basis; that is what he told us people." Capt. Chadwick, C. B. St. George, and Thos. St. George, and probably others, testify to declarations made to them by Mr. Hayes, in regard to his contract with Capt. Cola, corroborating his statement.

Capt. B. T. Willis was, at the time, keeper, or captain, of the Cape Fear Coast Guard Station, at Smith's Island, near by the place at which the Edilio grounded. He saw her before she went on the shoal and went to her; boarded her at 8:30 a. m.; found Capt. Adkins there; he went to Southport and left with direction to witness to remain; he did so until 11 o'clock p. m.; that Mr. Hayes and another man, who he says was either Lawrence or Lemuel Brown (they were both in the room while Willis was testifying, they are brothers, and resemble each other very greatly) only one came into the cabin. Capt. Cola asked witness to remain. After describing the meeting of Brown, as he boarded the Edilio, his conversation with Capt. Cola in regard to Mr. Hayes coming on board, Willis says that Capt. Brown introduced Mr. Hayes to Capt. Cola.

"Then Mr. Hayes went on and told him of the bad situation his ship was in; told him she was in danger; in fact, he had about the only facilities there were in this vicinity for floating her and wanted to take right hold and float her, but the captain wanted to know his price, and Mr. Hayes said: 'I can't make you a price, we will have to leave that to the court to decide; I will have to salvage the ship.' And the captain said, 'Salvage, no, no, no salvage' in his ship."

Hayes said he was at very heavy expense, with the fishing boats costing considerable money and, while the fish were not there, then he had just got a telegram to-day that the fish are coming. "So the captain said, 'What you take hold for?' And he said, 'I can't think

about taking hold only to salvage the ship,' and the captain said: 'You can't salvage my ship. I can't hear to that, you must make a price, we will have to have a price of some kind,' and he said, 'Tides are very short on high water.'"

The captain offered him $25 per tide for each boat that pulls. Hayes declined this; said he could not take it except for salvage. "About this time some one hollered, and I stepped on deck to see who it was, see what he wanted, and whoever it was said, * * * 'The cutter will be down to pull in the morning at 8 o'clock,' so Mr. Sprunt informed him. I said, 'All right,' and I stepped right back in the cabin and said: 'The cutter will be here in the morning. I have just received a message from her.' And the captain said: 'All right, then we won't need you unless you are willing to assist,' as I understood, for the $25. That was all I heard." Mr. Hayes left. Capt. Willis says that he told Capt. Adkins of the conversation the next morning. Capt. Adkins corroborates Willis in this respect, says Capt. Willis told him the next morning of the conversation between Capt. Cola and Mr. Hayes—as he testified—to same effect. Capt. Adkins had notified Mr. Sprunt of condition of the ship, and he got in communication with captain of the Seminole; he went to the ship early Sunday morning. That Capt. Cola did not wish to make any contract until he saw Mr. Sprunt is shown by the testimony of Jas. S. Williams, who says that he was at Southport when the Edilio went aground; had his tug there; that he went to the Edilio before noon and asked him "if there was any assistance I could render. I was told, 'nothing until the captain could see his agent.'"

Capt. Adkins says that he remained on the ship as pilot; took charge of her and remained all day Saturday; made some efforts to moor her without success; left Saturday afternoon, left Willis in charge, to remain until high water that night; went to Southport and took up the matter with Mr. Sprunt over the phone; advised him of ship's condition; went to ship next morning at 6 o'clock; during the morning some of the fishing steamers came; that he advised Capt. Cola to employ them to pull on the ship. "There could be no arrangements arrived at, price or figures, for getting the help of the fishing boats. Mr. Hayes refused absolutely to consider any price or offer whatever that might be tendered. I induced the captain to allow me, or persuade him to let the boats pull, and if he could do no better to settle the question of his services by arbitration, and if that could not be done to have recourse to the courts, which was the only alternative. Several times Mr. Hayes remarked that he would take hold of the ship only on a salvage basis. The captain refused absolutely to even countenance the matter, and my advice to him, as I thought it was proper, was not to assent to anything that was on a salvage basis, as the ship was not in a position to be salved."

The foregoing is, substantially, the direct evidence regarding the terms upon which the libelants' boats rendered service to the ship. The conduct of Mr. Hayes and Capt. Cola during the effort to pull the ship from the shoal throws light upon the question. Several of the crew on the Edilio testify that Capt. Cola told them, after Mr.

Hayes left the ship, that he had a contract with him for "pulling on the ship." The burden of proof to establish the contract as alleged is upon the libelants. It is manifest that Mr. Hayes, as did Capt. Cola, fully understood the import of the word "salvage," when used in connection with the terms upon which the service was to be rendered and accepted. One was insistently endeavoring to make it the basic factor in the contract, while the other was equally insistent upon keeping it out. Capt. Cola well understood the situation of his ship— an experienced pilot, with full knowledge of the situation, had been with him during the entire day and, as he says, did the unusual thing of leaving her at night with Capt. Willis, because he did not consider her in a dangerous position. Capt. Cola knew that Capt. Adkins would return in the morning; that he was within a short distance of Southport, in communication by rail, water, and telephone, with the ship's agent at Wilmington, some 30 miles distant; that the cutter was at Wilmington; and, after Capt. Willis delivered the message, that she would come Sunday morning. The weather was fair. Soundings had been taken during the day, showing the depth of the water and character of the shoal, that the ship was in no immediate danger from that source. Mr. Hayes is the only witness who thought the weather was bad, that the "wind was strong and the seas high," that the ship was "in a bad and dangerous place, and that she was hard and fast aground." There is no suggestion that Capt. Cola, or Capt. Adkins had sent, or caused the phone message to be sent to Mr. Hayes. It does not appear who sent it.

It is manifest that the suggestion of salving the ship had been made; the question which had engaged the attention of Capt. Cola and his pilot was that of "pulling her off." Without attributing any improper motive to Mr. Hayes, it is manifest that he had on his mind the purpose of making a "salvage contract," or a contract to render service on a "salvage basis," with a full recognition of the financial advantage of securing such a contract. It is equally clear that Capt Cola, not only had no purpose to make any such contract, but promptly and vigorously rejected the suggestion. The reasons are manifest. He said repeatedly that he would not do so until he consulted with Mr. Sprunt, the ship's agent. He went to Wilmington for the purpose, Monday morning. Libelants' witnesses are all interested, as is Capt. Cola. Capt. Willis and Capt. Adkins have no financial interest in the suit, or its result. It is difficult to reconcile the conduct of Mr. Hayes on Sunday, as testified to by Capt. Adkins, with his contention that, on Saturday night he had made a contract to render the service on a salvage basis. Either he is mistaken, or he was concealing from Capt. Adkins the fact that he had made the contract as he alleges. He says that he told Capt. Cola, on Saturday night, that it would be necessary to lighter the ship, and that he assented to his doing so. The evidence all shows that Capt. Cola did not think it was necessary and only consented to it after conferring with Mr. Sprunt. I am constrained to reach the conclusion that the only service libelants contracted to render, and Capt. Cola to accept, was that of pulling on the ship, aiding in getting her off the shoal, and that for such service the amount to be

paid was, if not agreed upon, to be fixed by arbitration, or by the court. We are thus brought to a consideration of the character of the service rendered and the award which should be made.

[3] A large number of witnesses, with many contradictory statements and conflicting opinions, were heard. Eliminating that which is repetition and speculation, the essential facts in regard to the service rendered and its effect upon the ship are not complicated.

On Sunday morning, October 29, 1916, Mr. Hayes went to the ship with two fishing vessels, the Adroit and the Lawrence, reaching there before high tide. The revenue cutter Seminole, a short time thereafter, and under the direction of Capt. Adkins, they all pulled on the ship, until the tide fell, about two hours. Hayes says some of the parties estimated that they pulled her the length of the ship, but he did not "think we moved her so far." Adkins says that:

"The efforts caused the ship to move about 20 feet on that tide after the Seminole got hold of the ship. She didn't move until the Seminole got hold of her."

The tug Gladiator was also pulling. Adkins said that he had "absolute range." After the boats stopped pulling, Adkins wished to run the starboard anchor. This was done for the purpose of keeping her head to the channel and from drifting further upon the shoal. The steamers Lawrence and Portland, which had come to the ship, ran the anchor Sunday afternoon. Hayes says that it was given 60 fathoms of chain. Others say it was only 45.

On Monday morning, early, five fishing boats belonging to libelants, the Lawrence, Price, Portland, Pocomoke, and Adroit, went to the Edilio. The Seminole reached her at 8:25 a. m. They all pulled during the tide, about one hour and a half. Capt. Uberroth, of the Seminole, says that he took the bearings of the ship by his compass and could not observe that she had changed her original bearings, "south by east, about one-half east." Adkins says the ship moved, on Monday, about 135 feet. Mr. Hayes says 200 or 300 feet; this was "on a line of her head; she may have moved sidewise." Capt. Adkins wished the starboard anchor, which had been run on Sunday, rerun. This was done, and the port anchor was run Monday afternoon, after the boats had stopped pulling. The port anchor had 75 fathoms.

On Tuesday all of libelants' boats pulled on the Edilio, began an hour and a half before high water, "because, in getting in position with three sets of boats pulling all across the tide, it was necessary to maneuver with the length of hawsers between these boats and from the stern of the boats to the ship." The Seminole and the Gladiator were also pulling. This was continued until the tide began to fall. The Seminole, after the tide, returned to Wilmington. Capt. Uberroth says:

"I did not see that the vessel had been moved at all at the end of the third day. I looked particularly. Her bow headed the same way."

Mr. Hayes says:

"They heaved on the anchors, and we pulled on the ship. The tide had fallen off that day about 18 inches lower than it had on previous days, and I

went aboard to see the captain, and told him I presumed now that he was satisfied that the ship had to be lightered. He made the remark that it would have to be so. I proposed that we start to lighter her. Mr. James Williams was aboard. He had gone on Monday night, and was there that morning when I got there. The captain referred me to Mr. Williams, and I spoke to Mr. Williams about lightering her. He said he guessed the ship would have to be lightered, but he would have to go ashore, and would see me at Southport; that he had talked with Mr. Sprunt, who wanted to hire me by the day, or so much per boat, to lighter the ship. I told Mr. Williams I had made a trade with the captain to salve the ship and I couldn't make any trade that would, in any way, interfere with that."

Adkins says that, on Tuesday, he placed Capt. Willis on the forecastle head to transmit such orders as he gave. He reported that, on heaving on the anchors, they were not holding—were not holding singly. "I told him to heave on both at the same time, which he had the mates to do. Adkins says that the starboard anchor had only 45 fathoms on Sunday, that it was not holding at all; it was of no assistance." He says:

"The efforts put forth Sunday, Monday, and Tuesday were wasted in the floating of the ship. I consider these words futile."

On Sunday evening Capt. Cola went to Southport, and, Monday morning, took the train for Wilmington, about 30 miles distant, for the purpose of seeing Mr. Sprunt. While Capt. Cola was in Wilmington on Monday, Mr. Sprunt made an arrangement, by which Mr. Williams was to go to the ship, as his representative, and, if she did not float on Tuesday morning's tide, he was to lighter the cargo and do what was necessary to float the ship. He went to the ship Monday night, with the understanding, with Mr. Sprunt, that he was to let the boats pull on the ship during Tuesday morning's tide, and if they did not get her off he was to make arrangements to get her off as he thought best and proper. Capt. Cola returned from Wilmington to the ship Monday night. On Tuesday the boats all pulled, but the ship did not move. Mr. Hayes was there, and asked about lightering the ship. Mr. Williams says:

"I asked him what kind of a bargain he would make, to come alongside and load the fish boats with iron, to name the price per ton, price per boat, or price per day to lighter on work on the ship, to float her, or a lump sum for the whole. He refused to name any price. He said he would not estimate what his expenses would be. He would do all he could without a bargain, which he considered not binding then, and would not make any definite bargain."

Mr. Williams refused to accept the service upon these terms, and said that he would get lighters in Wilmington; that Mr. Sprunt had instructed him not to employ any one without having a definite understanding. This was Tuesday afternoon. We have here a direct conflict between Mr. Hayes and Mr. Williams. Capt. Adkins says that he heard the conversation, but does not remember the exact words used by them, but the substance was that Mr. Williams said to Mr. Hayes, if he would furnish his boats and say what he would accept for them, he would submit the proposition to "somebody, he didn't say who." Mr. Hayes said he would accept no such proposition; he refused "to consider anything of the sort, as I understood at the time." If "he said anything about having a contract with the captain, I didn't

hear it." Mr. Williams says that he ordered the lighter Beaver to Southport at daylight, Wednesday, to proceed to the ship. He also secured the barge Davidson, and later the Fredericks. After the boats stopped pulling Tuesday, Capt. Cola discharged them. This was done about 11 o'clock. The captain of the Lawrence and other ships were told that they would not be longer needed. Capt. Lemuel Brown, on the Lawrence, was requested to "cast off from the ship, cast the ship's hawser off." They had the ship's hawser fast to the boat. He said he would be glad to do so, but had positive orders not to cast off from the ship. Capt. Brown says that Mr. Hayes had directed him not to cast off from the ship. Thereupon some officer of the Edilio cut the hawser of the Lawrence. It is conceded that the boats of the libelants were discharged on Tuesday afternoon and did not again pull on the Edilio. One of them stood off, near to her, Wednesday, and the captains say that they were ready to return Wednesday, if called upon. On Wednesday, Mr. Williams, pursuant to the arrangement made in Wilmington, on Monday, with Mr. Sprunt and Capt. Cola, and as the representative of Mr. Sprunt, Lloyd's agent, took charge of the Edilio. The capacity of her tanks was 2,700 tons. After securing the service of the barges, he directed that water be pumped into the tanks and began taking the cargo off—lightering the ship. As he took the cargo out, he had water pumped into the tanks. He took from the ship 1,100 tons of the cargo. He describes the manner in which he concluded the work:

"On Friday, November 3d, the wind was northeast, fresh, at 7 a. m. We began working the engines ahead about 12 o'clock and heaving on the anchors. * * * The Seminole anchored on the starboard bow. At 12:30 the Seminole made fast. The Gladiator then went ahead of the Seminole and pulled off the starboard. At 1 p. m. the ship swung to the starboard, as soon as the hawser tautened, and started to move ahead, immediately to one side and ahead, and never stopped. When she started, she never stopped. Her engines were worked astern, but she ran over her anchors; the winch couldn't take up the anchors fast enough. She was going off the shoal. We at first thought the anchors were dragging. I don't know whether they were or not that morning, but we thought they were until we stopped heaving. We were surging on the anchors, heaving them up, and when we slacked them down, and stopped, I knew the ship was moving. The ship's draft was about 27" less than before the lightering was begun. The ship was in the channel at 1:45 p. m. and proceeded to Wilmington. * * * I was satisfied with the soundings at all times."

He gave the soundings, as recorded, when taken, and produced a diagram made by him from the soundings. She was libeled, for $100,-000, November 4, 1916, the day following her arrival, gave bond, was released, and proceeded on her home voyage.

In support of libelants' contention that Mr. Hayes contracted with Capt. Cola to salve the ship and, in doing so, to lighter her, he says that he engaged the barge Fredericks to go to the Edilio for that purpose, and that the barge was there on Tuesday. The evidence in regard to the movement of the Fredericks is somewhat contradictory; but it is clear that, by direction of Mr. Hayes, she was at the place where the Edilio was aground on Tuesday morning. On Wednesday, after his boats were discharged, and he found that Mr. Williams would

lighter the ship, Mr. Hayes released the Fredericks and she was employed by Mr. Williams.

Claimants contend that the service rendered by libelants was not salvage, but mere towage, and should be compensated upon that basis; whereas, libelants insist that the Edilio was in peril; that she was in a dangerous position in the shoal, and the subject of salvage service. The evidence shows that, while she was on the shoal, broadside to the ocean during the entire time she was there, the weather was fair, winds light, and conditions, in all respects, favorable. The opinions of witnesses differ as to the probability of a storm, and its probable effect upon her safety. There was no storm, no high wind, nor other change in the weather, which affected her position or increased the danger. The witnesses having the largest experience with vessels situate as the Edilio are of the opinion that nothing short of a hurricane blowing from the southwest would have injured or endangered her. There is no evidence indicating that the conduct of libelants' seamen, in charge of the boats, was affected by apprehension of change in the weather; they made no extra or hazardous exertions exposing themselves, or their property, to danger, on that account.

While the definition of a "salvage service," found in standard works on admiralty, and well-considered cases, as distinguished from "towage," are clear enough, it is frequently difficult to place each case on the right side of the line of separation. Judge Brawley, in The Apache (C. C.) 124 Fed. 905, and Besnard (D. C.) 144 Fed. 992, examines, with great care, the decisions, both English and American. The conclusion reached by him is that:

"Any service, or assistance, applied for, or received by, a vessel in peril, or distress, which in any measure conduces to its safety, is in the nature of salvage service."

In The Lowther Castle (D. C.) 195 Fed. 604, Judge Rellstab says:

"A 'salvage service' is a service which is voluntarily rendered to a vessel, needing assistance, and is designed to relieve her from some distress or danger, either present or to be reasonably apprehended. * * * Assisting a vessel 'in a situation of actual apprehension, though not of actual danger,' is salvage."

Dr. Lushington, in The Charlotte, 3 W. Rob. 68, says:

"All services rendered at sea to a vessel in distress are salvage services. It is not necessary that the distress should be immediate and absolute; it will be sufficient, if, at the time the service is rendered, the vessel has encountered any damage or misfortune, which might possibly expose her to destruction, if the service was not rendered."

In The Phantom, L. R. 1 A. C. 58, he says:

"It is sufficient, if there is a state of difficulty or reasonable apprehension" or "if there be a possible contingency that serious consequences must have ensued." The Ella Constance, 33 L. J. Adm. 191; The Hesper (C. C.) 18 Fed. 696; The Brina P. Pendleton (D. C.) 200 Fed. 848; The Urko Mendi (D. C.) 216 Fed. 427.

While the danger was remote, the Edilio was on a shoal, exposed to the ocean. She had met with a misfortune; she had failed to come off on her own steam; she required assistance to enable her to float.

The service rendered by libelants in pulling on her, and running her anchors, comes within the definition of "salvage service," but is of a low order. I have had more difficulty in finding that the service resulted in benefit to the ship. The "pulling" done on her does not appear to have contributed, in any appreciable degree, to getting her off the shoal. It is probable that the anchors, in some measure, did so. It is doubtful whether, without them, she would have gone further on the shoal. It was prudent to run them.

It is clear, however, that Capt. Cola accepted the services of the boats, and promised to pay therefor such amount as the court of admiralty should award. The Alcazar (D. C.) 227 Fed. 633. The anchors were run by direction of the pilot, who was, in that respect, the representative of Capt. Cola. Assuming that the service actually rendered was salvage "of a low order," as classified by Judge Brawley in The Besnard, supra, in which the remuneration earned would be little more than compensation pro opere et labore, what sum should be awarded libelants? An answer to this question necessitates a consideration of the elements which should enter into the award. The evidence, in regard to the value of the Edilio and her cargo, is in a small compass, but very conflicting. I dismiss Mr. Hayes' statement that Capt. Cola told him that the ship was worth $2,000,000, the cargo $500,000, and his freight money $600,000. Capt. Cola manifestly could not have done so, and if he did it was not true. Mr. Sprunt says that, prior to the beginning of the war, the Edilio would have cost $300,000; "her value was enhanced by war conditions nearly three-fold, approximately nearly $800,000." He further says:

"Were she under the American flag, and not subject to extra war risks, and requisition as all trading vessels of the belligerents are, her value at that time would have been greater."

Mr. Sprunt has been engaged in the shipping business, at Wilmington 51 years; has served as Commissioner of Navigation and Pilotage 26 years; 31 years British Consul, and 5 years Imperial German Consul; resigned three years before war was declared; has been 7 years Lloyd's agent at Wilmington, has recently bought a large ship. He is a very large exporter of cotton. He says that $1,000,000 is a fair value of the Edilio. Her manifest showed the value of her cargo to be $83,500. The ship was sailing under requisition of the Italian government, then at war with Austria. This affected her value. She had no cotton on board at the time she went aground. Mr. Sprunt says that the freight on the cotton, which she took on at Wilmington, 7,200 bales, amounted to $93,364.66.

Mr. Edward Koles, a ship broker, residing in New York, for 16 years, says that the Edilio is registered in British Lloyds, "Italian Steamer A 1." Her cash market value, October 28th, would be $225 to $250 per ton, dead weight. He does not think that the fact that she was sailing under the Italian flag would affect her value at all. While this may be, to some extent, a matter of opinion, I am impressed with the reasonableness of Mr. Sprunt's statement in this respect. It stands to reason that, in the condition of the war, a vessel sailing under a neutral flag would be safer than one sailing under the flag of a

belligerent, and therefore of larger present market value. Two large vessels, sailing under the German flag, were, at the time of the hearing, "tied up" in the port of Wilmington, and had been so since the war begun. Certainly the valuation placed upon them prior to the war would not be the same at this time. Of course, the danger to an Italian ship was not so great, but it was sufficient to affect her market value, to some extent. I think $1,000,000 a fair valuation for the ship, and $83,500 for her cargo. There is no satisfactory method of fixing the freight.

The value of the salvor's property employed, and the danger to which it was exposed—Mr. Hayes fixes the values: Lawrence, $50,-000. She was built 1879; thoroughly rebuilt ten years ago. Eugene F. Price, $40,000. Pocomoke, $25,000. Portland, $10,000. Fannie M., $8,000. He gave the length, beam, horse power, etc., of each of the vessels. There was quite a large mass of evidence bearing upon the condition and value of the vessels. The estimate placed upon them by Mr. Hayes impresses me as rather extravagant.

The time and labor occupied:

On Sunday two boats pulled on the Edilio for about two hours. The Portland ran the starboard anchor.

On Monday five boats pulled, during the tide, about two hours. Two boats ran the port anchor, and reran the starboard anchor.

On Tuesday five boats pulled during the tide about the same time. The Fannie M., after the boats were discharged, stood by the Edilio. It is not very clear what service she rendered in doing so.

The items which have given me most concern are: The damage alleged to have been sustained by the boats, claimed by libelants, aggregating $16,325.87, all of which, Mr. Hayes says, was sustained by them in pulling on the Edilio, and running two anchors, and rerunning one of them. This includes $3,400.50 for alleged injury to hawsers, and one anchor chain.

While it is impracticable to set forth the evidence in regard to the hawsers and ropes alleged to have been injured and destroyed, it is sufficient to say that the charge impresses me as exaggerated. Libelants introduce Mr. I. J. Anderton, vice president of the Newport Products Company, owner of the John L. Lawrence and the Price, and lessors of the Fisheries Products Company. He says that he saw these vessels, and the Pocomoke, before they worked on the steamship Edilio, "before they left my charge." Has examined them since they came back, has them under repair. Has a memorandum of an "itemized list" of necessary repairs. "I estimate that the engine of the Lawrence would require approximately $2,700, and the hull $2,-225." In the itemized statement furnished by Mr. Hayes, he puts "the actual cost of replacing and repairing" damage to engines, three items, $2,697.60. Mr. Anderton estimates damage to the Price $425 on the condenser, and $1,088 on the hull. Mr. Hayes states that the "actual cost of repairing and replacing" hull is $1,088.60, in eight separate items. Condenser $425, two items. Mr. Anderton estimates the Pocomoke $2,509 on the engine, and $1,228 on the hull. Mr. Hayes says that "the actual cost of repairing and replacing" engine $2,509.60 four items, hull $1,228. Counsel said to Anderton:

"I understand you to say that the figures you have given are your estimates of what it would cost to repair damages done by this salvage operation, as they were reported to you?" He answered: "As they were reported to me."

He says that he did not take into account other repairs for wear and tear. He made the estimate about Christmas, 1916. These estimates are made by the vice president of the owner of the boats, and of the company which was to make the repairs. Mr. Hayes gives, in the statement filed, "detailed account showing damage and actual cost of repairing same to the different steamers while engaged in salving the Italian steamship Edilio at Cape Fear Bar." He does not, in his evidence, say that he had paid out any money for repairs. He says, "The whole thing is attributable to this operation." The testimony was taken March 27, 1917. It does not appear that any repairs have been made, therefore no money paid out for it. The boats were used in fishing, making, as will appear later, large "catches" of fish, during the remaining part of the season, until December 8, 1916.

The claim made by libelants for this item of $16,325.87 and damage sustained, on account of pulling on a ship, in a smooth sea, under the control of the libelants' skilled seamen, for a daily average of two hours, for three days, calls for careful investigation and clear corroboration. This is emphasized when it appears that Jas. S. Williams, with three barges, the Seminole and the Gladiator, lightered and floated the Edilio at a total cost of $11,380.90.

Libelants, as the basis for enlarging the award, files a statement showing an average catch of fish during the months of October and November, 1916, as follows: The five boats caught a daily average of fish, during the month of October, 1916, of 1,240 barrels, which the witnesses testify were worth $4.50 per barrel, making $5,580, from which they deduct average daily expense $609.75, making a net profit per day of $4,970.25.

By a similar process of calculation, the result is reached that the daily profit on the vessels for November amounted to $18,167.26. An analysis of the statement filed shows that between October 18th and 26th, the Price fished one day, catching 87 barrels; on October 26th she caught 127; and October 27th, 390 barrels; October 28th she was not fishing.

The Portland, between the 18th and 26th of October, fished two days, catching 465 barrels. On the 26th she was not fishing, on the 27th she caught 103 barrels, and on the 28th she was not fishing. The Lawrence, between the 18th and 26th, fished two days, catching 787 barrels. On the 26th she was not fishing. On the 27th she caught 260 barrels. On the 28th she was not fishing. The Pocomoke, between the 18th and 26th, fished two days, catching 622 barrels. On the 26th she caught 205 barrels; on the 27th, 27 barrels; on the 28th she was not fishing. This analysis is interesting from two viewpoints. None of the boats were fishing on Saturday, 28th of October. It shows that any estimated average of the quantity of fish boats would catch each day is speculative. It may also explain Mr. Hayes' willingness to engage his boats on a salvage venture, beginning on Sunday. It is noticeable that fishing in November was more than three times as profitable as during the month of October. Notwithstanding the dis-

charge of the vessels on Tuesday afternoon, October 31st, none of them fished on Wednesday, November 1st. It is a little singular that, with their experience, on the three days preceding, in which they are alleged to have sustained damage, amounting to more than $16,000, besides losing heavily on their fishing venture, they lay by the Edilio, on Wednesday, after their relations were so rudely severed, even to the cutting of the hawser. The Price on the 2d and 3d November caught 960 barrels. The Adroit caught 496 barrels. The Portland caught 263 barrels. The Lawrence caught 1,291 barrels. The Pocomoke caught 1,030 barrels. It is significant that five vessels which, it was estimated, on October 29th, 30th, and 31st had sustained damage to their engines and hulls, estimated at $12,928.37, and their hawsers and rope of $3,400.50, caught, in 14 days, without any repairs, during the month of November, a daily average of 4,225 barrels of fish, as against 1,240 during October.

An analysis of the statement for November is interesting. On nine days the boats did not fish on account of "bad weather." The Price, whose engines and hull were estimated to have been damaged by pulling on the ship, $2,263.60, caught between November 17th and 28th, inclusive, 12,050 barrels, fishing six days. The Lawrence estimated to have been damaged, hull, engine, and hawser $6,485, caught between November 15th and 25th, inclusive, 7,600 barrels, fishing four days. The other days the "weather was bad," and Sundays intervened. It is not suggested that they did not fish on account of injuries. The "statement" in regard to the catch of fish is assumed to be correct; the difficulty which I find is in reconciling it with the estimates of the damage to the boats, "the whole of which is attributable to this operation." The claimants' witnesses say that the hawsers were old and of small value. There is evidence raising serious doubts in regard to the character and extent of the alleged injuries to the boats. There is direct evidence that a part of the injury was sustained after one of the boats went to the factory.

It is conceded that the Lawrence was built in 1879, and had been sold by the marshal of this court at public auction November, 1914, for $21,000. The Pocomoke was built in 1902. The Portland 1879, sold by the marshal, at same time, for $2,941. The Adroit 1902, sold at the same time for $2,850. It is true, Mr. Hayes says, that they had been rebuilt, 1911. Certainly by their use in fishing they had sustained some strain, by wear and tear. Mr. Hayes admits that he stated to Capt. Cola that his boats were suited for the work, and that he may have said to him that he was the only person in that section who had the equipment to pull him off, or salve the ship. The estimates, as well as the claim that all of the injuries are attributable to the service rendered the Edilio, are unreliable and unsatisfactory. The burden was on the libelants to show, at least by candid, frank statements, to a reasonable degree of certainty, what damage was actually sustained, which was chargeable to this work. Although the boats continued in active service, fishing and coming daily to the factory near to Wilmington, until the latter part of December, 1916, it does not appear that he called the attention of any disinterested person to their condition, or the character or extent of the damage sustained in the service to

the ship. He waited until they were delivered to their owner at Newport, R. I. There is a striking agreement between the estimates of the vice president and Mr. Hayes, both of whom are interested in placing the cost of repair at large figures.

Many witnesses, with much contradiction, testified in regard to the anchors; their weight, manner in which they were run and planted, danger involved in running, their effect on the ship. Almost every phase of this portion of the service is controverted. Libelants insist that its boats alone had the capacity to run them; no others could have done so; that, in doing so, they and the men engaged in the service were subjected to very great hazard, and that the boats sustained great damage; that the anchors were of very great help in holding the ship in position, and enabling her to come off the shoal—all of which is denied by claimants. There is direct evidence that other boats could have run the anchors.

It is clear, however, that the anchors were run by direction of Capt. Adkins, the pilot. I do not deem it material to inquire whether other boats could have done so, because the pilot directed it to be done by the Portland and the Lawrence. While it is true that the weight of the anchors and chains imposed a strain on the Portland, no complaint was made, on either day, that she was sustaining serious damage. On the contrary, libelants' witnesses testify that "she was specially rigged for running anchors," and had "been doing it a great many years." She was under the control of her captain and crew, whose duty it was to protect her. Capt. Brown says that he had "run a great many anchors." It is true that running anchors requires skill and experience, and is, from the character of the work, attended with more or less danger to life and limb of the men engaged in the service.

The conditions under which these anchors were run would seem to have reduced the danger to a low degree. The ship was on the sand, sea was smooth, weather fair; every condition conduced to safety and success. There is marked divergence between the witnesses respecting the skill and judgment displayed by the captain and his crew, and the efficiency of the anchors in aiding the ship. It is impossible to reconcile the opinions of witnesses. Either from experience which they had in such work, interest, or other more or less disturbing causes, their minds run along conflicting currents, reaching different conclusions. Capt. Burriss, Capt. Pepper, Mr. L. H. Skinner, Dunbar Davis, and other witnesses, who are disinterested and have experience, think that it was a service requiring a high degree of skill and attended with much danger. The officers on the Seminole think that there is but little danger. Lt. Rhine has had 11 years' experience in coast guard service, now on Seminole, was on her Sunday morning, when she went to Edilio, and each day thereafter. He was asked by the court:

"What is your opinion as to the risk involved to the boat, or to your men, in running an anchor under these conditions?" Answer: "Under the conditions which prevailed at the Edilio there was no risk; I should not have considered that there was any risk"—for which opinion he gave his reasons.

He did not think she would go further ashore; that, from the soundings, it appeared "that there was just as much sand under her bow,

probably a little more, when they were through pulling, as when we started." He read the log of the Seminole, showing operations each day. His testimony is clear, intelligent, and enlightening. He says that, in his opinion, the ship was in no danger, except straining. The controversy, in regard to the anchors, affects the amount of the award from several viewpoints—the danger involved in running them; the effect upon the boats; the skill with which they were run; the judgment exercised in planting them. Their effect upon the ship, both in holding her in position, preventing her going further on the shoal, and the aid which they gave to the Seminole in pulling her off, must be considered in estimating the extent to which they contributed to the success of Mr. Williams in floating the ship. Several of libelants' witnesses are of the opinion that they were of great value, in both respects; that without them she could not have been pulled off by the Seminole. Claimants' witnesses think that they were not properly placed; that they rendered no aid in securing the final result.

Capt. Edgar Williams, a licensed master of steam vessels, engaged in the wrecking business 50 years, who had frequently run anchors for ships, familiar with the position of the Edilio on the shoal, was of the opinion that the ship, as she was upon the shoal, was in no danger, giving his reason therefor. He says that it was worth $300 or $400 to run both anchors—would have done it for that sum. In reply to a question by the court, he said:

"The anchors, the Gladiator, the fishing boats, the cutter, all combined, co-operated to bring about one result; each contributed to the ultimate result."

And herein, probably, is found the truth.

While I do not accept, as conclusive, the opinions of several witnesses that the ship, after being lightered, could not, with the aid of her engines, have been pulled off by the Seminole without the aid of the anchors, I am of the opinion that they contributed, in some degree, to the movement of the ship. Of course, the extent is conjectural. I have found the statements and opinions of Capt. Uberroth and his officers on the Seminole, intelligent, fair, and helpful. They, at all times, did all that was possible to aid the ship and, without bias, have given an intelligent account of the situation and conduct of all persons engaged in the service.

The next and largest item which libelants insist should enter into the award is the loss sustained by the withdrawal of the vessels from fishing. All of the witnesses who heard the conversation testify that Mr. Hayes, on Saturday night, October 28th, told Capt. Cola that his boats were engaged in catching fish and bringing them to the factory; that he was at heavy expense; and "that fish were in abundance along the coast, and it would cost him a lot of money to employ me or employ these boats to work on his steamship." Capt. Cola says that Mr. Hayes said: "Have big factory, and if come with fishing boats obliged to close factory." It was, therefore, in the light of this condition, that Capt. Cola contracted with Mr. Hayes to pull on the ship. The loss sustained by libelants from this cause, if it can be ascertained with a reasonable degree of certainty, should be considered in fixing the

amount of the award. Of necessity, it is impossible to do more than estimate the quantity of fish which each boat would have caught during the two days, not counting Sunday, on which they were engaged in pulling and running the anchors. Counsel for libelants frankly concede that:

"It is not perfectly clear that the fishing boats could have caught anything on Monday or Tuesday, but the evidence seems to show the average catch per day."

I concur with them that "no compensation without taking into account this probable loss would be fair and just." By this, it is not meant that a specific sum can be fixed upon, and charged to the Edilio, but that all of the facts, conditions, reasonable probabilities, should be taken into account—the degree of success or the extent to which the service rendered was of benefit to the ship.

It is not seriously insisted that the position of the ship was appreciably changed, or her removal from the shoal either expedited, or contributed to, by the pulling on her done by the libelants' boats, in connection with the Seminole. While she was moved on Sunday about 20 feet, and on Monday about 135 feet, it is manifest that this was of little, if any, benefit to her, nor did it improve her condition, either in respect to apprehended danger, or going further upon the shoals. Mr. Hayes, together with all of those engaged in the service concurs in this. The log of the Seminole shows that Capt. Uberroth advised Capt. Cola Monday to secure the services of a "wrecking company to send equipment for floating him."

Notwithstanding the opinion of a number of witnesses that the anchors did not contribute to the movement which brought her off the shoal, after being lightered, Mr. Williams says:

"On Friday morning, we began working the engine, and heaving on the anchors, about 12 o'clock. * * * We were surging on the anchors, heaving them up, and when we slacked them down, I knew that the ship was moving."

He does not think the anchors were run properly; but they appear to have been run under the direction of Capt. Adkins, the pilot. He says:

"It was impossible to heave on the anchors when she started off, because she slacked so fast when she started she went right on."

Judge Hughes, whose experience in salvage cases on the Atlantic Coast between Norfolk and Charleston probably exceeded that of any District Judge, and whose opinions evince ability, learning, and labor, in The Sandringham (D. C.) 10 Fed. 556, says that:

"Although * * * this amount lies within the discretion of the" court, yet a judge "is not at liberty to render an arbitrary judgment at his own individual discretion or caprice, * * * but must be governed * * * by the teachings of precedents, and * * * principles of the law of salvage."

Judge Seaman, in The J. Emory Owen (D. C.) 128 Fed. 996, says:

"While the value of the property saved enters into determination of the value of the salvage service, as an essential element, and the maritime law intends encouragement of gallantry and adventure in the relief of distressed ·

vessels, it is not the policy of that law to grant awards which tend to excite greed or promote unreasonable pretensions on the part of salvors, nor to disregard, in any measure, the interests of the owner of the rescued property."

It is said that, although Sunday was not a fishing day, it was customary for the boats to go out on Sunday afternoon, get up the coast, and be in a position to begin work Monday morning. While the labor performed on Sunday should be considered, the question of loss from this source is too indefinite to enter into the amount of the award. In a case in which a salvor voluntarily, and from a sense of duty to a ship in distress, and without having an agreement, or opportunity to make one, goes to the rescue of a ship in distress, and sustains loss by reason of the withdrawal from fishing and injury to his vessel, such loss of service and injury should be taken into account. When, however, as in this case, the libelant knew the capacity and condition of his boats, and the character of the work which he was undertaking, and enters upon it after negotiation and "chaffering," carefully safeguarding his interests, he should be presumed to have known the extent to which he was voluntarily, and for profit, exposing his property. He should be held to have known the danger to which he was subjecting it. He represented them to Capt. Cola as in proper condition and as having capacity to do the work which he undertook. Assuming that the boats were injured, certainly such injury must, to some extent, have been the result of their age—wear and tear, in fishing. It is difficult to understand how boats, of the value placed upon them by Mr. Hayes, and in excellent condition, as he represented, could have sustained the injury claimed, in the service rendered the Edilio. Capt. Adkins testifies that, at the end of each day, the captains were told that they need not return unless they desired. It is perfectly clear that Mr. Hayes and his captains were not only willing, but anxious to undertake and continue the service, and only left it when compelled to do so by Capt. Cola, and then they "stood by" the ship, hoping for further opportunity to render service to the ship.

The question presented here, in regard to injury to the boats and loss of profits, has been considered by the English Admiralty Courts in several cases cited, in Kennedy on Salvage, 138, who says:

"The effect of these judgments, fairly read together, appears to be as follows: Whilst the amounts of damage, expense, or loss of profits, ought not, under ordinary circumstances, to be taken as 'fixed figures' or 'moneys numbered' to be added to the amount of the reward for actual salvage services, the fact that such damage, expense, or loss has been caused by the performance of the salvage service, is a fact which the court ought never to disregard in assessing the amount of the reward. But all the circumstances, of which this is only one, must be considered together, and it does not follow, necessarily, that because the salvor proves such damages, expenses, or losses, the court should fix the sum awarded high enough to cover them." Rockland & Rockport Lime Co. (D. C.) 175 Fed. 524.

The reasons upon which this conclusion are based are given by the learned author. He further says (page 142):

"The only expenses for which the Court of Admiralty may compensate the salvor in the award are: (1) Expenses properly incurred by the salvor in the furtherance of the salvage service, and before the vessel assisted has been

placed in a position of safety, and (2) expenses directly occasioned by the performance of the salvage service, as the cost of repairing damage, without any fault on the part of her officers or crew, has been caused to the salving vessel. * * * Claims under the first head of expense are closely scrutinized by the court, and must be strictly proven. * * * As to claims under the second head of expense, above mentioned, and also as to damages for detention during repairs, it is to be noticed that, if the repairs are rendered necessary by an injury suffered by the salving ship in the course of the salving service, the court presumes in favor of the salvors, in absence of proof to the contrary, that the injury was due, not to any fault or negligence on their part, but to the necessities of the salvage service. But no allowance will be made for the cost of repairs, or detention during repairs, or for any loss, if the injury is not the proximate result of the service."

It would be manifestly unjust to include in this award, as "fixed sums," the amount claimed to have been lost by reason of loss of profits in the quantity and value of fish, which may have been caught during the time the boats were engaged in the service, amounting to many thousands of dollars, when it is shown that the actual cost of floating the ship, including compensation for all service, was $11,380.

Counsel for libelants say:

"In addition, * * * according to the principles applied in such cases, the libelants should be compensated as though they had done the whole work, and upon a liberal scale, not, of course, exorbitantly."

This contention is based upon the theory that the contract made by Capt. Cola, with Mr. Hayes, entitled the latter to salve the ship and, in doing so, to lighter her. If it had appeared that Capt. Cola wrongfully, capriciously, or for any other improper reason, discharged the fishing boats, while they were in the successful prosecution of the work, and prevented them from completing the service, for which he had contracted, that of pulling on the ship, I should not hesitate to take into consideration such amount as the boats would have earned if permitted to continue, to a successful completion, such service. It is, however, manifest that they would not have done so. This, Mr. Hayes concedes. His complaint is that he was not permitted to lighter the ship. The evidence respecting his ability to do so leaves it in doubt. I think that he was given a full and fair opportunity to complete the service contracted for. If his contention regarding the injury which his boats were sustaining, and the loss, by reason of their not fishing, is correct, it is apparent that the extent of the liability to which the ship would have been subjected by further pulling and lightering would have grown to an enormous amount. With ample equipment, prompt and intelligent action, Mr. Williams was engaged three days in lightering and floating the ship. If, to say nothing of the damage to his boats, Mr. Hayes' company was sustaining a loss exceeding $6,000 a day, because the boats were detained from fishing, it is difficult to see how he was damaged by reason of being relieved of a service which was performed by Mr. Williams for $11,380. It would be to impose hard terms upon the Edilio to require her captain to continue in his service a salvor, at expense of more than $6,000 a day, whose boats were being damaged, as claimed to the extent of $5,000 a day, adding an immense sum to his liability, when an experienced, skilled, and

as the result showed, thoroughly equipped agency, was ready to perform the service, and promptly relieve her, for $11,380. From a viewpoint most favorable to the libelants' contention, it is difficult to perceive how it sustained damage, by reason of the course pursued by the captain of the Edilio and her agents.

The principles by which courts are governed in making salvage awards are well stated by Judge Brawley in The Apache (C. C.) 124 Fed. 913:

"It is the policy of the maritime law to encourage spontaneous services rendered in going to the aid of a ship in distress, by giving some remuneration beyond the value of the work actually done, as an encouragement to induce the salvor and future salvors to incur risk in saving life and property; but this extra remuneration is always proportioned to the risks encountered and the services actually rendered, and it is never the policy of the law, nor in accordance with justice, to allow a situation created by calamity to be converted * * * for extortion."

Mr. Hughes, Admiralty (133) says:

"Each case has its peculiar circumstances, and the amount of a salvage award is largely a matter of judicial discretion, varying with the idiosyncrasies of the judge, and regulated only by certain general rules. These are largely corollaries from the fundamental doctrine that salvage is the outgrowth of an enlightened public policy, and is awarded, not merely on a niggardly calculation pro opere et labore in the special case, but as an encouragement to induce the salvor and future salvors to incur risk in saving life and property."

[4] If, however, as it appears in this case, the service was rendered, not in response to a prompt and generous willingness to relieve distress, to save life and property from imminent danger, but only after negotiation with the parties at arm's length, an insistence on the part of the libelants that the condition of the ship was more dangerous than the facts justified, and an effort to make a hard and fast bargain for salvage, with the amount of compensation left open, the court will be slow to make a large award, based upon alleged voluntary service and heroic conduct. The conduct of Mr. Hayes in this case is not unlike that of the libelant in The Brina P. Pendleton (D. C.) 200 Fed. 848. Before undertaking the service, he was keeping in mind the question of compensation and determined to leave it unsettled, refusing to name a price. An examination of several cases, to which counsel have called attention, will indicate the trend of opinion on the subject. Because of the fact that the vessel was on a shoal near by that on which the Edilio grounded, The Penobscot (D. C.) 103 Fed. 205, is in point. Judge Purnell describes the situation of the schooner and the libelant's boat:

The Wilmington, a passenger boat, "seeing a schooner in, or near, the breakers, where he knew she ought not to be, from his familiarity with the coast, after 25 years' service on this bar, with her flag in the rigging, Union down, libelant put his passengers ashore, and went to the rescue of the schooner. The schooner was found to be on a sand shoal, head on, pounding heavily, leaking; * * * life boat in the water, oars adrift; sails down; some of crew's baggage on deck, and some in the small boat. The vessel was not in the breakers, but the breakers were under her bow. The tide was rising, and at that point the current was west. * * * The wind was blowing the schooner on shore. She was drawing 12 foot water, and her bow

was in about 9 feet of water. Wind was blowing 16 miles W. S. W. and driving schooner onto shoal. * * * The schooner was in imminent * * * peril of being driven ashore and wrecked." No other boat was within call. "There was much danger to the Wilmington in going to the schooner, under the circumstances. * * * There was no contract. When the master of the schooner asked Harper what he would charge to pull her off, Harper replied, in substance, that it was not a matter of charge or contract; that if he did not pull him off there would be no charge."

The value of the schooner and her cargo was $11,750. The amount claimed was $2,500. The court allowed $2,000. The Circuit Court of Appeals reduced it to $1,000. The Penobscot, 106 Fed. 419, 45 C. C. A. 372. The judge said:

"This is not salvage service of a low order, but a service which required experience, bravery, and good seamanship. It involved risk of both life and property."

The facts stated present, more strongly than argument could do, the clearly marked distinction, in almost every respect, from the instant case. The case of The Besnard (D. C.) 144 Fed. 992, presents the distinctive line which separates it from The Penobscot; Judge Brawley states, with his uniform clearness, the facts, and, with evident doubt, he reaches the conclusion that, under the authorities, the service rendered was salvage. There, as here, was an attempt to make a contract. He says:

"The testimony makes it clear that the bark was not in fact in a position of danger, at the time the service was rendered, and there was no reasonable ground to apprehend danger, except such as is incident to all vessels at sea. There was no signal of distress, or request for any other assistance than a tow, and the service rendered was precisely the same in kind and degree as that which would have been required if the vessel had been intact. * * * Her master had never intimated any apprehension of personal danger, or any intention of seeking personal safety; for, even when far out at sea, he had declined offers of passing steamers to take off himself and crew. Any peril that can properly be said to have been impending was inconsiderable, uncertain, and distant, existing rather in the imagination of the putative salvors than in reality. Not one of those elements likely to enhance the claim for liberal remuneration enters here. There was no special skill or dexterity displayed, no fatigue endured, no courage evinced, not the least danger encountered. Even were it conceded that this is a case of a vessel in distress, and therefore a case of salvage, it would be salvage of the lowest [possible] order, and the remuneration justly earned would be little more than compensation pro opere et labore."

The bark had sustained serious injury in a water spout. She was damaged and sold for $8,500. Her freight was $4,200 and her cargo $300,000. The award was $1,000. Judge Brawley reviewed a large number of cases. His opinion is enlightening.

In The Lucia (D. C.) 222 Fed. 1015, the ship, value $300,000, with cargo $30,000, went on shoal or sand bar on Florida Coast. The tug Coney, jettisoned about 200 tons of her cargo, pulled on her two days, when she came off, and proceeded on her own steam. The testimony, in regard to sand, was similar to that found in this case. Judge Call found that:

The service was salvage, "but of the lowest grade. There was no risk of property, peril to life or limb, unusual expense, gallantry, courage or heroism.

* * * The property saved the Lucia was in a certain amount of danger, for, as has been well said, ships are intended to float, and, when they go aground, there is always danger attendant. She is out of her element. * * * But I fail to find in this case the elements that would authorize a large award for the service rendered."

There, as here, the captain of the tug refused to enter into a contract with the captain of the ship. To the argument stressed there, as in this case, the dangerous character of the coast, and the large awards usually made for salvage service, the judge says: "But in this instant case the considerations that induced these large awards are entirely wanting." This language is applicable to the conditions found here. The court awarded $4,000, cost to be paid from that sum. It will be observed that the service was successful.

In The Planter (D. C.) 217 Fed. 161, for successful service of a low order to a vessel of $23,400 value by a tug of $35,000, an award of $800 and $40 to two members of the crew was allowed.

Judge Dickinson (E. D. Pa.), in The Urko Mendi (D. C.) 216 Fed. 427, gives expression to a state of mind in which I sympathize. He says that:

"In determining the amount of salvage to be decreed, there is no fixed rule nor binding precedent nor practice in admiralty."

For a successful salvage service of a low order, rendered by a tug of the value of $40,000 to a ship and cargo of $112,500, he awarded $500.

Counsel for libelants cite The Sandringham (D. C.) 10 Fed. 583. In that case Judge Hughes, after setting forth the condition of the vessel salved and the character of the service rendered, says:

"The ship herself was in great peril; indeed, her condition was well-nigh hopeless. * * * The task of the wreckers was full of toil and risk, performed, as it was, on a dangerous coast, liable to sudden storms and sea swells. The work was bravely undertaken, * * * faithfully pursued, and successfully accomplished."

The wreckers were awarded 25 per cent. of the value of the ship and cargo. In The Craster Hall (D. C.) 203 Fed. 188, the judge found the condition of the ship dangerous. She was pounding, for a while heavily. The service was "meritorious, and, in view of the promptitude and skill in which it was rendered, highly meritorious." An award of 5 per cent. was made on a valuation of $497,000. The Varzin (D. C.) 180 Fed. 892; The Loch Garve, 182 Fed. 519, 105 C. C. A. 57.

In The Nicholas (D. C.) 147 Fed. 793, Judge Hazel says:

"Some risk, perhaps, was taken by the Amazonas, in backing on the reef and towards the distressed steamer; but, to properly lessen this risk, it should not be forgotten that soundings were properly and skillfully taken, and that there was sufficient depth of water in the immediate locality to insure a reasonably safe undertaking. Neither the sea nor the wind were troublesome."

The ship salved valued at $127,000, the salving ship and cargo $149,-000. The award was $1,220. The Peter White (D. C.) 149 Fed. 594.

In The Devonian (D. C.) 150 Fed. 831, Judge Dodge rendered an interesting and enlightening opinion, discussing several elements entering into the award found in this case. The value of the ship salved $800,000, tug $55,000. The award $4,500.

Without further pursuing decided cases, the language of Judge Pardee in The Hesper (C. C.) 18 Fed. 696, is worthy of note, in the light of the evidence in this record:

"The evidence shows that there was no enterprise in going out in tempestuous weather, as the weather was moderate, and the libelants only went out when called upon and employed so to do. The labor and skill furnished were of the ordinary kind, such as libelants' boats were seeking as ordinary employment. Salvage, then, is to be determined entirely by the distress in which the salved property was." To several of the arguments here his language is apposite. "That storms might have come that would have destroyed the vessel; that the salving tug [was] injured herself in tugging at the ship salved, etc. It is true that all encouragement should be given to mariners, ships, and landsmen to save property imperiled on the high seas, but where there is no chance for the exercise of gallantry, heroism, or risk, why should an already distressed and imperiled ship be subject to pay additional expenses for ordinary services, and these expenses be chargeable solely to her calamity? That storms might have come is true, but, from the fact, I am unable to see why a distressed vessel should pay money to those boats that can, of their own volition, seek safety. * * * It is difficult for the court to see why a salved vessel should be compelled to pay, in addition to ordinary salvage, repairs for unseaworthy crafts that may come to her assistance."

There are, of course, several differentiating facts between that, and the present, case, as there are between all cases. The Hesper was valued at $100,000, cargo $6,500, award $4,200, affirmed in 122 U. S. 256, 7 Sup. Ct. 1177, 30 L. Ed. 1175. The element of the award in this case, which has given me most concern, is the fact that the services of the boats were contracted for by Capt. Cola, with knowledge of their withdrawal from the enterprise in which they were engaged, resulting not only in the loss of fish, but in closing the factory. The evidence in regard to this phase of the case is not contradicted. The owner of the boats was undoubtedly at large expense in the payment of salaries and wages to its officers and employés. It would be difficult, if not impossible, in view of the conditions under which the business of the libelants' company is conducted—the fact that the season for fishing is only a few months, the necessity of making all of the time possible during the season and other factors—to fix the rental value of the fishing boats for several days, when they are withdrawn from fishing. The only basis upon which any just or fair estimate of the loss sustained, on account of the service rendered, is an approximation, upon the data furnished, of the probable "catch" of fish. I have given the conflicting and, in many respects, contradictory, evidence, anxious consideration. The wide and irreconcilable difference of viewpoints of the parties, and their learned, zealous counsel, imposed the duty of the most careful consideration. I have reached the conclusion that, considering all of the elements which should enter into the award, the sum of $10,000 should be paid by claimants. In fixing this amount, I am not inadvertent to the slight benefit which accrued to the ship from the service rendered by libelants' boats. The principal factor which has controlled my mind is the probable loss sustained by the

libelants' company in the withdrawal of the boats from fishing. Unless the libelants' company can come to an agreement respecting the apportionment of the award, I will direct a reference.

In regard to the cost, I am impressed with the fact that, although Mr. Hayes testifies that the amount of the compensation was to be either agreed upon, or settled by arbitration, before resort was had to the court, he made no effort to come to an agreement, or submit to arbitrators, but, immediately upon the arrival of the ship at Wilmington, and without any demand for an adjustment, libeled the ship for $100,000. He says that he knew that she was to take on a cargo of cotton, which would require some time. He also knew that Alexander Sprunt & Son were her agents. The Edilio was required to give a bond, at a large expense, for $100,000, until reduced by the court to $50,000. In view of the conduct of libelants throughout the transaction, the cost will be apportioned: Each party will pay the cost of subpœna, service, mileage, and per diem, of its witnesses, and of taking and filing each deposition, including the amount paid the commissioners. All other cost, including stenographer, will be divided equally. A decree will be drawn accordingly.